SNR DENTON US LLP
1221 Avenue of the Americas, 24th Floor
New York, New York 10020-1089
(212) 768-6700
Peter D. Wolfson
peter.wolfson@snrdenton.com

Attorneys for Plaintiff
RUFFINO, S.r.l.

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUFFINO, S.r.l., an Italian limited liability company, | Case No. |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |
| vs. | |
| CONSTELLATION BRANDS, INC., a Delaware corporation, | |
| Defendant. | |

## I.  NATURE OF ACTION

This is an action by Ruffino, S.r.l. ("Ruffino"), an Italian winemaker, for injunctive relief

and damages against Defendant Constellation Brands, Inc. ("Constellation").  Ruffino primarily

seeks to enjoin an improper attempt by Defendant Constellation to terminate a 10-year fixed term

exclusive importation agreement under which Constellation is Ruffino's sole U.S. importer and

the purchaser of approximately 60 percent of all Ruffino wines worldwide ("Importation

Agreement").  Should the termination go forward, Ruffino will suffer irreparable and substantial

harm.

The notice of termination issued by Constellation for the Importation Agreement is a

sham.  It was sent in bad faith, with the knowledge that it has no basis in fact, no basis in law,

and no basis in the agreement of the parties.  Any right to terminate the Importation Agreement

further has been expressly waived and released in a knowing written waiver and release signed by Constellation, and further by Constellation's own conduct.

Constellation's efforts to terminate the Importation Agreement in fact have nothing to do with the importation and distribution of Ruffino wines or the performance or alleged non-performance of Ruffino.   It instead is solely a part of an illegitimate scheme by Constellation to avoid the independent obligations of its subsidiary to purchase shares of stock in Ruffino pursuant to an agreed pricing formula under a separate stockholders' agreement.  Constellation is trying to thwart that transaction by holding Ruffino, its business and the very livelihood of its 125 employees and their families hostage through its unlawful termination of the Importation Agreement.

### Parties, Jurisdiction, and Venue

1.      Plaintiff Ruffino S.r.l.  ("Ruffino") is an Italian limited liability company with its principal place of business in Brescia, Italy.   Ruffino has been a producer and bottler of Chianti and other Italian wines for more than 130 years.   Approximately 60 percent of its entire production is distributed in the United States pursuant to an Importation Agreement with Constellation Brands, Inc. entered into in December 2004.

2.      Defendant Constellation Brands, Inc. ("Constellation" or "CBI") is a publicly traded Delaware corporation with its principal place of business in Victor, New York.  Constellation is a massive worldwide importer and distributor of wines, spirits and beer, with sales for its 2010 fiscal year of more than $4 Billion.  Constellation claims to be the world's leading premium wine company, with over 40 facilities and 6,000 employees throughout the world.   Its brand portfolio includes Robert Mondavi, Hardys and Clos du Bois wines.   Constellation is an S&P 500 Index company and its shares are listed on the New York Stock Exchange.

3.      This Court has original jurisdiction under 28 U.S.C. §1332 in that

(1)      The parties are a citizen of a State and of a foreign state; and

(2)      The amount in controversy substantially exceeds $75,000.00, exclusive of interest and costs.

4.      Venue is properly sited in this judicial district because the defendant Constellation is resident in the district and maintains its worldwide headquarters in the district.

## FACTS COMMON TO ALL COUNTS

*Ruffino has entrusted Constellation and its subsidiary with the exclusive importation, distribution and marketing of Ruffino products in the United States, under a long term written contract between the parties.*

5.      Ruffino has made wine in Italy for over 130 years and has imported wines into the United States for decades.   Its sales into the United States constitute the large majority of its total production.   Prior to December of 2004, Ruffino wines were distributed in the United States through Schieffelin & Co. for more than 50 years.

6.      On December 3, 2004, Ruffino and Constellation's subsidiary and predecessor in interest, Franciscan Vineyards, Inc. ("Franciscan"), entered into an Exclusive Importation Agreement (the "Importation Agreement") pursuant to which Franciscan was appointed as the exclusive importer of Ruffino's products in the United States.   A true and accurate copy of the Importation Agreement is attached hereto as Exhibit 1.

7.      At all times relevant to this case, Franciscan was a Delaware corporation wholly owned by and under the complete control of Constellation.

8.      The initial term of the Importation Agreement is for a period of 10 years ending December 31, 2014, with automatic renewal of the term for successive ten year periods unless earlier terminated under the express terms and conditions of the Agreement.

9.      The Importation Agreement provides, *inter alia,* that Ruffino appoints Franciscan as its exclusive importer to import, promote, market, sell and distribute Ruffino products in the United States, and that Franciscan accepts such appointment.

3

10.     Franciscan agrees that "[a]t all times during the Term" of the Importation Agreement, Franciscan shall promote and maximize the sale and distribution of Ruffino products in the United States equally with the efforts it normally devotes to its other wine products, but that without limiting the foregoing, Franciscan "at all times shall exercise no less than commercially reasonable efforts to promote and maximize the sale and distribution of Ruffino products in the United States" (emphasis added).

11.     The Importation Agreement requires Franciscan to maintain adequate stocks of the Ruffino products in order to facilitate prompt and effective distribution and properly service the needs of wholesalers and retailers in the United States.

12.     The Importation Agreement further requires Franciscan to generally spend a minimum of $5,500,000 each contract year during the term of the Agreement on the advertising and promotion of Ruffino products in the United States.

13.     On June 19, 2009, Ruffino, Franciscan, and Constellation executed an Amendment to Exclusive Importation Agreement, and in part agreed to a substitution of Constellation for Franciscan as a party to the Importation Agreement ("2009 Amendment").  A true and accurate copy of the 2009 Amendment is attached hereto as Exhibit 2.   Where the context requires, references to "Constellation" hereunder in relation to the Importation Agreement shall be deemed to refer to Franciscan for periods prior to the 2009 Amendment.

14.     The Importation Agreement may only be terminated pursuant to the express terms and conditions of Section 13 of the Agreement.   The relevant provision of the Section 13 of the Agreement is subsection (C), which provides for termination for material breach, as follows:

> "C. Termination for Material Breach.    Either party ('Notice Party')
> also may terminate this Agreement for cause by written notice of
> termination to the other party ('Defaulting Party') in the event the
> Defaulting Party breaches any of its material obligations or
> representations or warranties under this Agreement; provided that such
> written notice must declare such breach and describe such breach in
> reasonable detail and provided further that the Defaulting Party shall

> have sixty (60) days from the date of the written notice from the Notice Party to either fully cure such breach or to substantially cure such breach and thereafter diligently proceed to complete such cure.  If any claimed breach is not cured within the applicable cure period, then upon expiration of such period this Agreement shall terminate. Notwithstanding the foregoing to the contrary, such right to cure shall not be applicable to more than four (4) similar breaches in any twelve (12) month period during the Term."

15.    Under these provisions Constellation has no right to unilaterally terminate the Agreement without cause.

16.    At all times relevant to this action, Ruffino has fully performed all of its material obligations under the Importation Agreement.

17.    From the inception of the Importation Agreement to this day, Ruffino has entrusted Franciscan and then Constellation with sole and exclusive responsibility for the importation, sale, distribution and marketing of the majority of all Ruffino products worldwide, given the high concentration of the products' distribution in the United States.

18.    The Importation Agreement was entered into in December 2004 in connection with a concurrent but independent transaction, pursuant to which CB International Finance, S.a.r.l., a Luxembourg company which is a subsidiary of Constellation, acquired a 40 percent equity stock interest in Ruffino.  As part of the stock acquisition, Constellation or companies controlled by Constellation have been entitled to appoint several persons to the board of directors of Ruffino, and in fact have done so.

19.    At all times relevant hereto, Constellation directors so appointed have attended (in person or by telephone) all meetings of the Ruffino Board of Directors.   Those directors presently include Messrs. F. Paul Hetterich, the Executive Vice President of the Defendant Constellation; Ronald Fondiller, Senior Vice President and General Counsel of Constellation Wines US; and Messrs. Lisa Schnorr, Chris Francis Fehrnstrom, David Mark Thomas and John Ashforth Wright, all of whom are officers of Constellation or its affiliates.   During the 2004 to

2009 period, the Constellation directors on the Ruffino board also included Jon Moramarco, who

was the CEO of Icon Estates (which includes Franciscan) from 2003 to 2005, the CEO of

Constellation Europe from 2005 to 2007, and the CEO of Constellation International from 2007

to 2009.

20.     The Importation Agreement is an independent agreement and expressly states that it

sets forth the entire agreement between the parties relating to its subject matter.   To this end

Section 14(C) of the Agreement provides in pertinent part that:

> "This Agreement, together with its exhibits attached hereto, contains
> the entire agreement between the parties relating to the subject matter
> hereof, and supersedes any and all prior or contemporaneous
> agreements, understandings, representations or warranties, whether oral
> or written or express or implied…."

*In February 2011 Constellation purports to terminate the Importation Agreement based on*

*alleged breaches known to Constellation for a number of years.*

21.     By letter dated  February 17, 2011, Constellation notified Ruffino that, pursuant to

Section 13(C) of the Importation Agreement,  it was terminating the Importation Agreement for

cause, effective 60 days after the date of the letter ("Termination Letter").   A true and accurate

copy of the Termination Letter is attached hereto as Exhibit 3.

22.     The Termination Letter in substance claims that Ruffino failed to disclose certain

events involving Ruffino Chianti Classico wines (collectively the "Chianti Classico matter" or

"matters"), and in particular the alleged involvement of Ruffino's management in those matters,

all of which occurred after 2001 and became known to Constellation by the Fall of 2005.

23.     In particular, Constellation alleges in the Termination Letter:

(1)     that Ruffino's management was "directly and personally engaged in illegal

activity that ultimately resulted in the conviction of the directors of Ruffino and punishment

under Italian law. If the facts of management's participation in such illegal activity had been

disclosed to Constellation, Constellation would not have caused Franciscan to sign the Importation Agreement"; and

(2)    that after the inception of the Importation Agreement, Ruffino "deceitfully and falsely told Constellation and Franciscan that Ruffino was a victim of [the matters] and that Ruffino was not and had not been directly or personally involved" in the activity that gave rise to the Chianti Classico matter.

24.    On this basis the Termination Letter claims that the Importation Agreement was induced by fraud in the first instance, and that the alleged concealment of management's role in the matters constituted a breach of Ruffino's obligation under Section 14(L) of the Importation Agreement, which states that:

> "L.  Good Faith and Fair Dealing.   The parties recognize that portions of this Agreement are general in nature, and the parties acknowledge and agree that they shall operate in good faith and deal fairly with one another when interpreting and performing their respective obligations hereunder."

25.    The facts do not support Constellation's position.   The true fact is that the Termination Letter from Constellation is a complete sham.

26.    In October 2005, the Office of the Attorney General of Siena ("Procura di Siena") claimed in criminal proceedings that a large number of vintners in the Tuscany region of Italy, including but not limited to Ruffino, did not use grapes solely sourced from the Chianti de Classico district of Italy in certain vintages of its Chianti Classico wine, as required by Italian law.   In this connection the Office of the Attorney General of Siena alleged that Ruffino and its managing directors violated these rules, permitting the company to release wine with the improper designation of origin and thereby committing "fraud in commerce" and related offenses.

27.    As part of these proceedings, in September 2005 the Office of the Attorney General of Siena issued an order that certain quantities of wine held by Ruffino for the 2001 through

2004 vintages should be preemptively seized and not released into the market.   The seizure of the wine occurred on October 2 and October 13, 2005.   However, less than 30 days later and pursuant to an agreement with the Office of the Attorney General of Siena, the subject wine was "downgraded" to a lesser classification known as Indicazione Geografica Tipica (or "IGT") and released to Ruffino free and clear on November 7, 2005 (the IGT designation identifies wine from a specific region in Italy but does not conform to the standard applied to the Chianti Classico appellation).   Constellation was a participant in the efforts to obtain this release, and the reclassification of wine so released, all as more fully set out in paragraph 37 below.

28.     The Office of the Attorney General of Siena further agreed to allow the Ruffino managing directors to enter into a plea bargain with the Italian prosecutor – known as a *patteggiamento* – to resolve these matters at the managing director level.   The patteggiamento plead agreements were approved and recommended by the Ruffino Board of Directors at their board meeting on December 23, 2005, and were eventually entered into by the individual Ruffino managing directors with the Italian prosecutor on November 6, 2007.   Under Italian law, the patteggiamento plea and any judgment or conviction based on the plea cannot be used as an admission of fraud in any subsequent civil case.

29.     The Italian taxing authorities subsequently asserted fines against the chairman of the board of directors of Ruffino and the company under related Italian laws, pursuant to a formal written notice of charges issued on April 15, 2009 to Ruffino.   These charges have been challenged by Ruffino and the related administrative proceedings are still pending. However, in light of an Italian legislative reform passed in April 2010 (which has significantly reduced the fines applicable to cases of mislabeled wine), the potential risk of administrative fines for Ruffino has been reduced to a maximum of only € 40,000.   No other fines or other additional action of any kind have been imposed on any of the individual managing directors.

30.     The claim that Ruffino concealed the alleged role of its management in the Chianti Classico matter is the <u>sole basis</u> for the termination stated by Constellation in the Termination

Letter.   However, even if this claim were true, it has no bearing on or relationship to the obligations of Ruffino under the Importation Agreement, does not constitute a breach or violation of any nature under the Agreement, and provides no grounds for termination.

31.     Constellation has never claimed and even now does not claim in the Termination Letter that Ruffino has breached any <u>substantive</u> provision of the Importation Agreement, including any obligations concerning the quality or certification or sale or delivery of Chianti Classico wines to Constellation.

32.     Furthermore, prior to the February 2011 Termination Letter, Constellation has never made a claim of breach or violation of <u>any kind</u> under the Importation Agreement, whether with respect to the Ruffino wines or the performance of Ruffino generally, notwithstanding Constellation's full knowledge of the circumstances of the Chianti Classico matter and its active collaboration with Ruffino for many years regarding the same.

33.     No later than October 2005, Constellation had full and actual knowledge of the Chianti Classico matters, including claims of the Italian prosecutors for commercial fraud and related charges against the individual Ruffino managing directors.  Constellation was further fully advised of all relevant legal proceedings as these progressed.   In summary form:

(1)     On October 4, 2005, the fact of the seizure of Ruffino wine by the Italian prosecutors and the status of proceedings with the authorities in connection with the Chianti Classico matters were reported to the entire Ruffino Board of Directors at a board meeting attended (in person or telephonically) by board members appointed by Constellation, and who were full time employees of Constellation or its wholly owned subsidiaries, including Messrs. Hetterich, Fondiller and Moramarco.  *Constellation directors were also  present and voting at all of the Board of Directors meetings described below.*

(2)     On October 24, 2005, an additional Ruffino Board of Directors meeting was held, and issues concerning the Chianti Classico matter were reported to the directors.  This

included the fact that the Italian authorities were requiring the downgrading of the Ruffino Chianti Classico wine stock to an IGT classification, which was approved by the unanimous vote of the directors present at the meeting; and the fact that the downgrading would adverse affect the Ruffino's financial position.   The Board of Directors were then specifically advised that the Italian prosecutor had instigated investigations of wrongdoing directly against individual Ruffino managing directors over the matter, including directors Marco Folonari, Angelica Lorenzetti, Luigi Folonari and Adolfo Folonari.  At that meeting the Board of Directors further authorized the appointment of  legal counsel to assist Ruffino in these investigations being carried out by the government prosecutor.   Messrs. Hetterich, Fondiller and Moramarco from Constellation were present and voting at the meeting.

(3)     On December 23, 2005, a full written report and related presentation was provided by counsel to the Ruffino Board of Directors regarding the criminal investigations, which discussed among other matters in detail: (1) the main facts of the matters under investigation by the Italian prosecutor, (2) the various entities and individuals involved, including the Ruffino managing directors, (3) the potential implications of the criminal investigations, (4) contractual relations between Ruffino and Franciscan under the Importation Agreement, and (5) recommended corporate and other measures.   Messrs. Hetterich, Fondiller and Moramarco from Constellation were present and voting at the meeting.   As part of this written report and presentation, the nature of the criminal charges against individual Ruffino managing directors and the proposed patteggiamento plea bargains were disclosed in specific detail to and discussed by the Board.   The Board unanimously approved counsel's report and expressly authorized and recommended the managing directors who were under investigation to pursue the possibility of plea bargains in accordance with the recommendation of counsel. *These are the same matters that Constellation now claims to have had hidden from it.*

(4)     On November 6, 2007, the individual Ruffino managing directors entered into the final patteggiamento plea bargains with the Italian prosecutor for the Chianti Classico matter. On December 3, 2007, a further report on the Chianti Classico matter was then made to the Ruffino Board of Directors at its meeting on that date.  This report included a review of the seizure of wine in October 2005, specific references to the board meeting of December 23, 2005 (where the facts of the Chianti Classico matter and proposed plea agreements were discussed and approved), information regarding subsequent proceedings, and confirmation that the plea agreements had been entered into by the individual Ruffino managing directors. Messrs. Hetterich, Fondiller and Moramarco from Constellation were present and voting at the meeting.

(5)     On April 15, 2009, the Italian tax authorities issued charges against the chairman of the Board of Ruffino and the company, relating to the Chianti Classico matter, pursuant to a formal written notice of charges issued to Ruffino on that date.

(6)     On May 7, 2009, another complete report on the Chianti Classico matter was given to the Board at its meeting on that date.  This report included a full summary of the matter, including references to the November 2007 plea agreements on criminal charges and the disclosure to the Board of the April 15, 2009 "notice of charges" by the Italian tax authorities, indicating that these authorities were seeking a substantial administrative fine in respect of criminal charges against Ruffino arising from the Chianti Classico matter.   This matter was fully disclosed to and discussed by the Board in detail at that time.  Messrs. Fondiller and Moramarco from Constellation were present at the meeting.

34.     Again, each and every one of the Ruffino board meetings described above were attended by officers and senior employees of Constellation.

35.     In addition, the Chianti Classico matter was widely reported in the trade and even public press at the time both in Italy and the United States. All knowledgeable persons in the wine industry were well aware of it, including Constellation's senior officers and directors.

*Constellation continues performance under the Importation Agreement year after year and causes Ruffino to continue its performance as well, all with full knowledge of the facts upon which it now asserts as grounds for termination of the Importation Agreement.*

36.     Armed with full and continuing knowledge of the Chianti Classico matter, Constellation nevertheless continued to perform under the Importation Agreement and to accept the material benefits of that Agreement, and to obtain the continuous and material performance of Ruffino under the Agreement as well.   These performances were active and ongoing, not passive.  Therefore from the commencement of the Importation Agreement to this day:

(1)     Ruffino has continued to manufacture and sell its wine products to Constellation under the Importation Agreement.

(2)     Constellation has continued to purchase and distribute Ruffino wines for the US market, *including the Chianti Classico wines which were at the heart of the matter.*

(3)     With respect to the two main Ruffino Chianti Classico lines, there was no interruption in the supply of the premiere Ruffino wine (Reserva Ducale "Gold") during any relevant period.   The second main Chianti Classico wine (Reserva Ducale "Tan") was subject only to a temporary delay involving a single vintage, during which Ruffino immediately secured substitute Chianti Classico sources for the wine and promptly and fully replenished US inventories.

(4)     Constellation and Ruffino have, consistent with the Importation Agreement, met on a continuing basis to establish annual marketing plans and to otherwise actively manage their relationship and the sale, distribution and marketing of Ruffino wines in the United States.

(5)     The Chianti Classico matter, including the alleged breach claimed by Constellation in the Termination Letter, has had de minimis or no negative impact on the sale, distribution and marketing of Ruffino wines in the United States.   This is demonstrated

by the schedule of the shipments of the Ruffino Chianti Classico and Chianti wine products by Ruffino to its US importer (Schieffelin & Co. in 2004, and Franciscan - Constellation in 2005 through 2009), and the corresponding schedule of the sales of such products by US distributors to wine retailers for the same period (known in the wine trade as "depletions"), attached hereto as Exhibit 4.

37.     Constellation also knowingly and actively participated with Ruffino in 2005 and 2006 in the repositioning and expansion of its product line in connection with the Chianti Classico matter, which was mutually beneficial to both parties:

(1)     As discussed above, after the Italian prosecutors seized wine from various firms and locations in the Tuscany region of Italy in October of 2005, including Ruffino, it informed Ruffino that quantities of unbottled wine for the 2001 through 2004 vintages and subject to a seizure order could be released if such quantities were either certified or were downgraded from the Chianti Classico D.O.C.G. designation to the lesser wine classification known as Indicazione Geografica Tipica ("IGT").   With Constellation's full knowledge, in November 2005 the authorities then released the wine to Ruffino, pursuant to an agreement that it would be bottled and relabeled with the appropriate IGT designation.

(2)     Commencing in November 2005, Constellation management, both through its board membership in Ruffino, and via its continuing contacts with the company, fully collaborated with Ruffino to establish marketing plans for the newly labeled wine and to create a new Ruffino product from this wine for distribution by Constellation in the United States, to be known as "Il Ducale IGT".  The Il Ducale IGT product was first released to the market in June 2006 and has proven to be a successful product for Ruffino and Constellation since then, averaging 25,000 cases of wine sold to and distributed by Constellation each year.

38.     Constellation has not only obtained Ruffino's continued performance under the Importation Agreement, it has made affirmative written assurances to unrelated third parties, in particular to Ruffino's bankers, that Constellation would continue to purchase wine from Ruffino

during the term of the Agreement, and thereby enable Ruffino to continue its performance under the Agreement:

(1)     As is common with many commercial firms, Ruffino has financing arrangements in place with various banks.   In connection with a restructuring of the Ruffino bank debt in June 2010, ten Italian banks and the Italian arm of G.E. Credit (collectively the "Banks") requested reasonable assurances of Ruffino's continued ability to operate over the foreseeable future.  All of these arrangements were and are subject to the approval of the Ruffino Board of Directors, including the directors appointed by Constellation.

(2)     In support of the financial restructuring by Ruffino, on June 17, 2010, Constellation issued a signed letter for the Banks entitled "Commitment to purchase Ruffino's Products" (the "Commitment").  The Commitment was issued by Constellation with the full knowledge that it would be relied upon by the Banks and by Ruffino itself in connection with its own undertaking and commitments to the Banks.  The relevant language of the Commitment signed by Constellation states as follows:

> "Constellation Brands, Inc…. confirms its undertaking to Ruffino S.r.l. ('Ruffino') to purchase 625,561 physical cases of Ruffino's Products during the period 1 January 2010 - 31 December 2010.
>
> Additionally, [Constellation] affirms its undertaking, set forth in Section 13D(iii) of the Exclusive Importation Agreement of 3 December 2 004 ('Agreement'), to purchase from Ruffino during each Contract Year in the period beginning on 1 January 2011 and ending on the date of termination of the Agreement, sufficient quantities of the Products to ensure that Ruffino receives at least seventy-five (75%) of the total gross revenues projected to be received by Ruffino from all purchases of Products by [Constellation] under the Marketing Plan for such Contract Year at the applicable export sales prices as set forth in the Marketing Plan."

A copy of the Commitment is attached hereto as Exhibit 5.

39.     The Commitment was provided to the Banks as part of the refinancing of Ruffino, and upon information and belief, the Banks relied upon the Commitment as in connection with

the refinancing, which occurred some twelve days later on June 29, 2010, and which remains in effect.

40.     The Commitment demonstrates that Constellation had no intention to terminate the Importation Agreement at any time on or prior to June 17, 2010 on any grounds, notwithstanding its full knowledge of the past issues involved in the Chianti Classico matter, including the April 15, 2009 notice of charges from the Italian tax authorities received over a year earlier.

> *Constellation Agrees to a Full Written Release, Discharge and Waiver of all Claims for Breach in June 2009.*

41.     In the spring of 2009, Constellation on its own behalf and on behalf of Franciscan approached Ruffino with a proposal to amend the Importation Agreement in certain material respects.  This amendment was requested by Constellation, not by Ruffino.   The proposed amendment to the Importation Agreement was negotiated and entered into by the relevant parties on June 19, 2009.  A copy of the 2009 Amendment is attached hereto as Exhibit 2.

42.     At the same time as the 2009 Amendment, Constellation further requested the shareholders of MPF International, S.A., then a Belgian company ("MPF") and the majority shareholder of Ruffino, to issue corporate guarantees in favor of Ruffino in order to hold Ruffino harmless against any liability arising from the administrative fines threatened by the Italian tax authorities by the notice of charges dated April 15, 2009.   The corporate guarantees issued by the shareholders of MPF (Perfect Harmony S.r.l. and Mauser S.r.l.) also were negotiated and entered into by the relevant parties on June 19, 2009.

43.     The Amendment and the foregoing corporate guarantees were approved by the Ruffino Board of Directors on June 19, 2009.

44.     These amendments and corporate guarantees materially benefited Constellation and Franciscan, in part by (1) replacing Franciscan Vineyards with Constellation Brands, Inc. as a principal party under the Importation Agreement, (2) eliminating the existing exclusive rights of

Ruffino to block importation of competing Italian wine brands by Constellation, and (3) and obtaining financial assurances to protect Ruffino (and by extension the equity interest of Constellation and its affiliates in Ruffino) from any fines or penalties arising out of the Chianti Classico matter.   These benefits and other terms constituted material consideration for entering into the Amendment by Constellation and Franciscan.

45.     Importantly, the 2009 Amendment also contains broad mutual releases and waivers for the parties to the Importation Agreement through the June 19, 2009 date of the Amendment. Section 6 of the Amendment expressly provides as follows:

> "6.     As part of the consideration for this Amendment, the parties hereto mutually waive and release and discharge each other from any and all breaches or other failures to perform by any party under the Importation Agreement at any time prior to and through the Effective Date of this Amendment, including any and all claims or actions or causes of action based thereon."

46.     Therefore, on June 19, 2009, some four years after being informed of criminal proceedings against Ruffino and its individual managing directors for commercial fraud and other claims involving the Chianti Classico products, some three years after being informed of the 2007 criminal plea agreements entered into by the individual Ruffino managing directors, and more than six weeks following disclosure to Constellation of the April 15, 2009 Notice of Charges by the Italian tax authorities (the last government proceeding in the entire Chianti Classico matter) and being provided with another full report of these matters, Constellation and Franciscan each knowingly waived and released and discharged Ruffino from "any and all" breaches or failures to perform under the Importation Agreement from the beginning of time through June 19, 2009, and from any and all claims or actions or causes of action based thereon.

47.     Moreover, in the event of any conflict between the 2009 Amendment and the Importation Agreement, the parties specifically agreed that the terms of the 2009 Amendment (including the mutual waivers and releases and discharges of Section 6 of the Amendment) shall be controlling.

48.     Any claims by Constellation that Ruffino has breached its obligations of good faith and fair dealing as set forth in Section 14(L) of the Importation Agreement – which are categorically denied by Ruffino – therefore have been fully and knowingly released, discharged and waived by Constellation, and cannot now be grounds for terminating the Importation Agreement.

49.     Section 13 of the Importation Agreement further provides that in the case of any claim of breach, the other party shall have sixty (60) days from the date of written notice to either fully cure such breach or to substantially cure such breach and thereafter diligently proceed to complete such cure.   Even if any and all alleged breaches by Ruffino of the Importation Agreement had not been fully released, discharged and waived by Section 6 of the Amendment, Ruffino had fully cured all alleged breaches prior to the notice period and therefore Constellation would have no cause to terminate the Importation Agreement for breach.

50.     Constellation's claim that the Importation Agreement was fraudulently induced is also barred by Section 13 of the 2009 Amendment.  That section expressly declares that "[e]xcept as expressly modified by the Amendment, the Importation Agreement is hereby confirmed in its entirety and shall remain in full force and effect unaffected by this Amendment" (emphasis added).   This language in the 2009 Amendment, and the execution and delivery of the Amendment by Constellation to Ruffino, constitutes the specific, express and knowing affirmation of the Importation Agreement by Constellation and eliminates any claim of fraud in the inducement or any similar cause as a matter of applicable law.   This affirmation is in addition to numerous other bases for rejecting any claim of fraud in the inducement or similar claims in this action.

51.     The affirmation of the Importation Agreement by Constellation by virtue of Section 13 of the 2009 Amendment therefore eliminates any grounds for terminating the Importation Agreement.

52.     Constellation moreover has affirmed the Importation Agreement by its continued performance of the Agreement and its acceptance of the material benefits of the Agreement for years following its knowledge of the alleged breaches by Ruffino.

53.     The continued performance by Constellation, the inducement and acceptance of the performance of Ruffino under the Importation Agreement, and the obtaining of the full benefits of the Agreement following knowledge of the alleged Ruffino breaches, further constitutes a binding election under applicable law to forego any right to terminate the Agreement.

*Constellation has ulterior motives for the issuance of the sham Termination Letter in this case: Its affiliate has an obligation to purchase the remaining equity in Ruffino from its current owner under an agreed pricing formula.  Constellation does not wish to honor this legally binding obligation and is attempting to avoid it by its bad faith termination of the Importation Agreement.*

54.     Prior to December of 2004, Ruffino was wholly owned by MPF International, S.A. ("MPF").

55.     In December of 2004, through a series of transaction agreements including a Quota Purchase Agreement (calling for the purchase of shares in Ruffino by Constellation), and a Joint Venture Agreement concerning the governance of Ruffino ("JVA"), CB International Finance S.a.r.l, a Luxembourg corporation and a wholly owned subsidiary of Constellation ("CBIF"), purchased a 40 percent ownership interest in Ruffino.  Constellation Brands, Inc. is a direct party to both agreements as a guarantor of certain obligations of CBIF under the Quota Purchase Agreement and the JVA.   By a transaction with another stockholder for the purchase of an additional 9.9 percent of Ruffino by CBIF, which closed only recently in May 2010, the current ownership of CBIF rose to 49.9 percent of Ruffino.

56.   The JVA states that MPF has the unilateral "put" right and option to require CBIF to purchase all of the Ruffino shares owned by MPF (currently representing 50.1 percent of the equity of the company), subject to certain terms and conditions.

57.   The price formulae for the purchase and sale of equity shares in Ruffino under the JVA vary under differing conditions:

(1)   If MPF elects to "put" its shares to CBIF during calendar year 2010, which MPF has done, the price CBIF is required to pay to purchase the shares is defined in a manner resulting in terms favorable to MPF.   In a Form 10-Q filing made by Constellation with the US Securities and Exchange Commission on July 12, 2010, Constellation estimated that the purchase price it would be required to pay to MPF under this put option could be as high as € 55 million (or $68 million at then applicable exchange rates).

(2)   However, if Constellation were to lawfully terminate the Importation Agreement with Ruffino, then under other provisions of the JVA, CBIF instead would be entitled to put its shares for purchase by MPF for a much more favorable price.   In its letter to MPF of February 23, 2010, purporting to exercise the termination put, CBIF claims that the purchase price to be paid by MPF would be € 89,071,977 (or approximately $124 million at current exchange rates).

(3)   If the JVA is terminated, then the right of MPF to put its shares for purchase by CBIF would be arguably eliminated altogether.

As indicated, these differences are measured in tens of millions of U.S. dollars. Constellation and its subsidiary CBIF therefore have ample financial motives to invent a reason to terminate the Importation Agreement, and even the JVA, if it appears that MPF will exercise its "put" option and force CBIF to purchase its shares at a highly favorable price.

*Ruffino's majority equity owner exercises its "put" option in 2010, leading to the sham*
*termination of the JVA and the Importation Agreement:*

58.     In June of 2010, MPF's owners decided to exercise their right and option to "put" their shares in Ruffino to CBIF, and orally informed Mr. Fondiller, Mr. Thomas, Ms. Schnorr, Mr. Fehrnstrom and Mr. Hetterich of Constellation of their intent to put the shares pursuant to the JVA.

59.     Mr. Fondiller responded by specifically asking MPF to "wait a few weeks" before delivering the written notice of exercise, claiming that Constellation's pending filings before the US Securities and Exchange Commission ("SEC") had been readied for final approval and submission, and a transaction of that magnitude would require them to be pulled, re-written and re-printed.   Mr. Fondiller further told the MPF representatives that he would advise them when a submission of the put option by MPF would be appropriate following the required SEC filings.

60.     In truth and in fact, however, the true purpose of the request by Constellation was to lull MPF into deferring the exercise of its put option until Constellation could attempt to take adverse action.

61.     On July 19, 2010, CBIF sent MPF a letter that purported to terminate the Quota Agreement and the JVA, the first step in blocking MPF's exercise of its put option to sell its shares in Ruffino to CBIF ("July 2010 Termination Notice").   The letter was sent to MPF from the office of Ronald Fondiller, both legal counsel for Constellation and a board member of Ruffino. As in the case of the sham termination of the Importation Agreement, the termination of the Quota Agreement and the JVA was based on the unsupportable theory that Constellation had been misled with respect to the Chianti Classico matter.   Constellation and CBIF later instituted arbitration proceedings in Italy to enforce the termination of the Quota Agreement and the JVA and void the put option of MPF.   Those proceedings are still pending.

62.     After due consideration, on December 16, 2010, MPF notified CBIF that it was exercising its put option and providing material relevant to price and closing date.  The MPF notice stated that it rejected the allegations of the July 2010 Termination Notice and the related arbitration, and that the failure to honor the MPF put option was wrongful.

63.     The response of Constellation was to issue the February 17, 2011 Termination Letter which is the subject of this action, purporting to terminate the Importation Agreement for the sole and improper purpose of gaining an advantage in the dispute with MPF under the JVA.

64.     True to form, on February 23, 2011, CBIF then purported to conditionally exercise its own Put Option for Termination of Importation Agreement against MPF, based on a special "trigger" caused by the concocted termination of the Importation Agreement.   CBIF specifically states in its February 23 letter that "this is the Right Notice, on the basis of which Constellation exercises the Put Option for Termination of Importation Agreement by Franciscan (to be currently referred to Constellation), as a consequence of the termination of the Importation Agreement by Constellation."  The put option price demanded by CBIF from MPF was € 89,071,977.

65.     In the absence of injunctive relief, Ruffino will have no importer, no distributors, and no marketing plan or staff in place for approximately 60 percent of its products worldwide, immediately requiring Ruffino to substantially curtail its operations, resulting in the loss of hundreds of jobs and placing the company itself in dire jeopardy.

## CAUSES OF ACTION

### I.

### First Cause of Action -- Injunction

66.     Ruffino repeats and incorporates the Facts Common to All Counts.

67.     The matters set out in the Termination Letter issued by Constellation to Ruffino on February 17, 2011, even if accurate, do not support a termination of the Importation Agreement

under the very terms of the Agreement.   Such matters further do not support any equitable form of termination or rescission, and in fact have been waived, discharged and released in all events by Constellation in the 2009 Amendment.   Finally, by reason of its course of conduct as well as the terms of the Amendment, Constellation elected to affirm the Importation Agreement and to forego any right to terminate, with full knowledge of the matters in the Termination Letter, and cannot resurrect such matters now as grounds for refusing to continue under the Importation Agreement or to purport to terminate the Agreement.

*Remedies for non-conforming products are limited, and do not include termination:*

68.   The Importation Agreement contains specific provisions governing matters such as nonconforming or defective goods and improper labeling, and restricts Constellation to a specific set of remedies. Thus in Section 9(D) of the Importation Agreement Ruffino represents and warrants that:

> "The Products, when they leave RUFFINO's care and control ex-cellars Pontassieve (FI), Italy, shall fully conform to all applicable Italian, European and United States laws and regulations governing their production and labeling, shall be of merchantable quality and fit for human consumption as wine or grappa or olive oil (as the case may be), in completely saleable condition, and shall not constitute items which may not be introduced into commerce under the U.S. Food, Drug and Cosmetics Act.... *Section 4(G) hereof sets forth the exclusive remedies for any defective or nonconforming Products or other claims of non-merchantability, other than for any claims arising out of the personal injury or death of any individual or damage to other property of a third party.*" [Importation Agreement, Sec. 9(D) (emphasis added)]

69.   Thus, even assuming for these purposes that Ruffino violated Italian or European laws by falsely or improperly claiming that wine shipped to Constellation was "Chianti Classico", Ruffino would have materially breached only Section 9(D) of the Importation Agreement.

70.    The remedies of Constellation in the case of defective or nonconforming products or related claims are limited under Section 4 of the Importation Agreement and do not permit termination of the Agreement.   To this end Section 4(G) of the Agreement states as follows:

> "G.    Exclusive Remedies.    Notwithstanding any contrary provision of this Agreement, including but not limited to Section 12 hereof, this Section 4 sets forth the exclusive remedies of FRANCISCAN for any defective or nonconforming Products or other claims of non-merchantability, other than for any claims arising out of the personal injury or death of any individual or damage to other property of a third party.  All payments to be made, or credits to be issued, by RUFFINO under this Section shall be promptly paid or granted to FRANCISCAN."

71.    Section 4(D) of the Importation Agreement in turn provides that if Ruffino ships nonconforming goods to Franciscan and Ruffino is at fault, then Ruffino has the unilateral right under Section 4(D) of the Agreement to either repurchase or credit the goods *or* to replace the defective or nonconforming products with other conforming products.   These are the sole and exclusive remedies under the Importation Agreement for the conduct of selling an improperly labeled or nonconforming wine.

72.    The Importation Agreement further contains specific termination procedures pursuant to Section 13(C) of the Importation Agreement.  Constellation has no unilateral right to terminate the Importation Agreement without cause.   Section 13(C) requires notice of a claim of material breach, and a 60 day period to cure any claimed breaches.  In this case Ruffino would have fully cured all alleged breaches well prior to the notice period.

73.    The sole breach of the Importation Agreement alleged by Constellation in its Termination Letter is a breach of Section 14(L) of the Agreement, which requires each of the parties to "operate in good faith and deal fairly with one another when interpreting and performing their respective obligations hereunder", because "portions of this Agreement are general in nature" (emphasis added).   This contractual obligation of good faith and fair dealing does not create a general duty between the parties but is narrowly confined by its terms to issues

of interpretation or performance of other express obligations under the Importation Agreement. Ruffino has not breached or violated the terms of this provision at any time or to any extent.

*Constellation – with full knowledge of all relevant facts – executed a full and complete release of the Chianti Classico matter.*

74.     When Constellation executed the June 19, 2009 Amendment to the Importation Agreement, it did so with full knowledge of every aspect of the Chianti Classico matter, including the plea agreement and later claims.   Therefore, any alleged breaches or failures to perform the Importation Agreement at any time prior to June 19, 2009 are fully waived, discharged and released and cannot now be grounds for terminating the Importation Agreement.

*Constellation elected to affirm the Importation Agreement by continuing its performance and obtaining the full benefits of the Agreement with full knowledge of the Chianti Classico matter, thereby barring any claim for termination or rescission.*

75.     No later than October 2005 Constellation was fully apprised of all of the relevant facts upon which it now purports to terminate the Importation Agreement with Ruffino. However Constellation affirmed the Importation Agreement when it continued – year after year – to seek the performance of Ruffino, and to continue its own performance and obtain the full benefits of the Agreement.  It cannot now assert the Chianti Classico matters as grounds to avoid its obligations.

76.     This would be the case under applicable law even if, *arguendo,* the factual allegations being made by Constellation were considered true.  Since the April 2009 charges by the Italian tax authorities and the related May 2009 Board of Directors meeting, Constellation (1) continued to perform and obtain the benefits of the Importation Agreement for an additional period of almost two years, (2) entered into the 2009 Amendment expressly confirming the terms and conditions of the Importation Agreement, and (3) signed and delivered the June 17, 2010 Commitment Letter for the Ruffino Banks (Exhibit 5) with full knowledge of the facts and

intending that the Letter be relied upon by the Banks and by Ruffino directly in connection with the financial restructuring of the company.

*Ruffino will suffer irreparable harm if the Importation Agreement is terminated improperly.*

77.    The wine and beverage market in the United States is highly competitive.

78.    Approximately 60 percent of the entire worldwide production of Ruffino wines is imported into the United States and sold by Constellation pursuant to the Importation Agreement.   Constellation is also responsible for 100 percent of Ruffino's marketing in the United States.

79.    Should the Importation Agreement be terminated prematurely, Ruffino will have no U.S. importer and no current U.S. marketing relationships.

80.    Should the Importation Agreement be terminated prematurely, Ruffino will not be able to replace its U.S. importer and reconstitute its U.S. distribution and marketing efforts within any reasonable period of time.

81.    Should the Importation Agreement be terminated prematurely, Ruffino will in all probability have to cease operations, ending a 130 year old business and putting 125 persons out of work during the worst economy in Italy in decades.

82.    The termination of the Importation Agreement or the consequences of such termination may further result in breach or noncompliance with contractual obligations to which Ruffino is bound under other agreements between the company and third parties, subjecting Ruffino to unwarranted and as yet unquantified but clearly very substantial additional legal and financial liabilities.

83.    Ruffino has no adequate remedy at law and Ruffino will suffer irreparable harm absent injunctive relief.

84.     By reason of the matters set out above, the purported termination of the Importation Agreement by Constellation is wrongful, and Ruffino is likely to succeed on the merits of this case for the reasons stated in this Complaint, including the entirely transparent and "trumped up" nature of the purported termination by Constellation and its blatant ulterior motives in doing so.

85.     The balance of hardship strongly favors Ruffino.  Constellation will suffer no legitimate hardship by maintaining the status quo and continuing to perform under the Importation Agreement in the same manner performed for more than the last six years and on terms it freely negotiated.   Ruffino and its employees, on the other hand, will suffer tremendous and immediate harm if the company is prematurely deprived of its entire United States distribution system, representing approximately 60 percent of the total worldwide production of the company.

WHEREFORE, Ruffino prays this Court preliminarily and permanently enjoin Defendant Constellation, and all persons, firms and entities controlled by Constellation, from terminating the Importation Agreement, whether by direct or constructive means, without prior leave of this Court.

## II.

### Second (Alternative) Cause of Action -- Damages for Wrongful Termination

86.     Ruffino repeats and incorporates Paragraphs 5 to 85 into this cause of action.

87.     The Termination Letter is an unequivocal statement of Constellation's intention to cease all performance under the Importation Agreement.

88.     Should this Court not enjoin Constellation from its purported termination of the Importation Agreement as stated in the Termination Letter, then the Termination Letter constitutes an anticipatory repudiation of the Importation Agreement and is a total breach of the same.

89.     At all times relevant to this action, Ruffino has fully performed all of its material obligations under the Importation Agreement and has not materially breached the Agreement.

90.     In the alternative, and for the reasons stated above,  any and all alleged breaches of the Importation Agreement by Ruffino have been waived, discharged and released by Constellation, and Constellation has elected to affirm the Agreement and to further forego any right to terminate notwithstanding its full knowledge of all relevant circumstances.

91.     Ruffino's damages by reason of Constellation's breach of the Importation Agreement, should such breach not be enjoined, will be shown at trial, but in no event are they less than $75,000, exclusive of interests, costs and fees.

92.     Ruffino is therefore entitled to, among other matters, recovery of damages, attorneys' fees and costs, plus interest.

WHEREFORE, Ruffino prays this Court for judgment in an amount to be proven and trial, but in no event less than $75,000.00, exclusive of interest and costs.

### Demand For Jury Trial

Ruffino demands a jury trial on all issues so triable.

Dated: March 17, 2011                    SNR DENTON US LLP


By: _____
                        Peter D. Wolfson
                        Attorneys for Plaintiff Ruffino, S.r.l.

27364866\V-4

27

# Exhibit 1

716 218 6216

## EXCLUSIVE IMPORTATION AGREEMENT

THIS EXCLUSIVE IMPORTATION AGREEMENT ("Agreement") is made and entered into as of ___3 December___, 2004 ("Effective Date") by and between RUFFINO S.r.l., an Italian società a responsabilità limitata with its registered office at Via Corsica, 12, Brescia, Italy ("RUFFINO"), and FRANCISCAN VINEYARDS, INC., a Delaware corporation with offices at 1178 Galleron Road, Rutherford, California 94574, United States of America ("FRANCISCAN").

### WITNESSETH:

WHEREAS, RUFFINO produces the Products, as defined below, and

WHEREAS, FRANCISCAN is experienced in the marketing and sale of wines in the Territory, as defined below, and

WHEREAS, RUFFINO desires to appoint FRANCISCAN as its exclusive importer of the Products in the Territory, and

WHEREAS, FRANCISCAN desires to accept such appointment,

NOW, THEREFORE, in consideration of the mutual promises herein and for other good and valuable consideration, receipt and sufficiency of which is acknowledged, RUFFINO and FRANCISCAN agree and do hereby agree to the following terms and conditions of this Agreement:

## Section 1. DEFINITIONS

The following terms shall have the meanings set out below:

A.     "Affiliate" shall mean, with respect to a party to this Agreement, any corporation or other entity which directly or indirectly controls such party, is controlled by such party or is under common control with such party, so long as such control exists. For purposes hereof, "control" as to a corporation or entity shall mean direct or indirect beneficial ownership of at least fifty percent (50%) of the voting stock of or other ownership or income interest in such corporation or entity, the control of the composition of the board of directors or comparable managing authority of such corporation or other entity, or such other relationship as, in fact, constitutes actual control; provided however that for the avoidance of doubt, (i) neither RUFFINO nor any of its subsidiaries shall be deemed to be an "Affiliate" of FRANCISCAN or Constellation or CBI or any of their respective Affiliates at any time; and (ii) none of the stockholders of CBI or any direct or indirect parent of CBI shall be deemed in such capacity to be "Affiliates" of FRANCISCAN or Constellation or CBI or their respective Affiliates at any time.

1

DEC-03-2004   09:18         CANANDAIGUA BRANDS ▲                     716 218 6216      P.03

716 218 6216

B.      "CBI" shall mean Constellation Brands, Inc., a Delaware corporation, or its successor or permitted assign.

C.      "Change of Control" shall mean in the case of FRANCISCAN or its direct or indirect parent or its permitted assign, at any time, any of the following circumstances or events: (i) a merger or consolidation or other business combination (however denominated) involving FRANCISCAN or such other related person, in which such entity is not the surviving entity; (ii) the sale, transfer or other disposition of all or substantially all of the assets of such entity other than where such action is merely taken to change jurisdiction or corporate form; (iii) the complete liquidation or dissolution of such entity; (iv) any reverse merger in which such entity is the surviving entity but in which direct or indirect "control" (as defined above) is transferred to a person or persons different from those who held control immediately prior to such merger; (v) any other acquisition of direct or indirect "control" of such entity by a person or persons different from those who held control immediately prior to such acquisition; or (vi) a material reduction in the number or quality of wine product brands owned or represented by FRANCISCAN or its permitted assign as of the Effective Date; in each case whether in a single or a series of related transactions.

D.      "Constellation" shall mean CB International Finance S.a.r.l., a Luxembourg company, or its successor or permitted assign.

E.      "Contract Year" shall mean the calendar year commencing on 1 January of each year during the Term.

F.      "entity" shall mean any firm, company, corporation, limited liability company, unincorporated association, partnership, trust, joint venture or other legal entity, and shall include any successor (by merger or otherwise) of such entity.

G.      "Laid-In Costs" shall mean the total of (i) the cost of goods for the subject Products paid by FRANCISCAN ex-cellars to RUFFINO; (ii) applicable freight and shipping costs incurred for the direct shipment of the subject Products to the US warehouse of FRANCISCAN or its wholesaler; (iii) customs duties, export and import fees incurred for the subject Products; and (iv) excise taxes incurred for the subject Products; (v) brokers' fees, cartage, and warehouse storage and handling fees of third-party warehouses.

H.      "New Products" shall mean all new Italian wine products jointly developed by the parties or their respective Affiliates; and all Products accepted under Section 2(C) hereof.

I.      "Other Products" shall mean (i) grappa and (ii) olive oil.



2

716 218 6216

J.      "parent" shall mean any corporation or other entity directly or indirectly controlling a party hereto, for so long as such control exists.

K.      "person" means any individual or entity or governmental authority.

L.      "Products" shall mean all wines and all Other Products produced by RUFFINO or its subsidiaries from time to time during the Term, including all sizes and vintage dates of such products; provided however that none of the Other Products shall be deemed to be a "Product" hereunder for purposes of Section 13(D)(Termination). The initial Products subject to this Agreement are listed by product brand on Exhibit A attached hereto and incorporated herein.  Such exhibit may be amended from time to time to reflect the agreed addition or deletion of items from the Products to be supplied by RUFFINO and imported and distributed by FRANCISCAN hereunder.  New Products shall also be added to Exhibit A when launched, and shall be deemed to be part of the "Products" hereunder.

M.      "QPA" shall mean that certain Quota Purchase Agreement dated as of _3_ December 2004 by and among Beverage and Brands S.A., MPF International S.A., Constellation, and CBI as guarantor, as the same may be amended or restated from time to time.

N.      "Quotaholders Agreement" shall mean that certain Quotaholders' Agreement dated as of _3_ December 2004 by and among Beverage and Brands S.A., MPF International S.A., Constellation, and CBI as guarantor, as the same may be amended or restated from time to time.

O.      "Rights Date" shall mean the date as of either (i) the date of the agreed termination of any commercial dealings or relationship between Schieffelin and RUFFINO with respect to RUFFINO products in the Territory, in the event that Schieffelin and RUFFINO enter into a mutually acceptable and legally binding agreement regarding such termination on or before 15 December 2004 ("Schieffelin Agreement"); or (ii) the Effective Date in the event that no Schieffelin Agreement is entered into on or before 15 December 2004.

P.      "Schieffelin" shall mean Schieffelin & Co., formerly known as Schieffelin & Somerset, and any successor thereto.

Q.      "subsidiary" shall mean any corporation or other entity directly or indirectly controlled by a party hereto, for so long as such control exists.

R.      "Territory" shall mean the domestic and duty free markets located within the United States of America, excluding its territories and possessions and Puerto Rico and all military bases and exchanges and the diplomatic corps outside the continental United States.



3

DEC-03-2004  09:18      CANANDAIGUA BRANDS  ▲                716 218 6216      P.05

716 218 6216

S.      "Term" of this Agreement is defined in Section 13 hereof.   All dates in this Agreement shall be deemed to commence as of 12:01 a.m. Italian time.

T.      "Trademarks" shall mean any trademark, trade name, trade dress, service mark, word mark, design mark, internet domain or logo (whether registered or not) ("Marks") owned or licensed by RUFFINO and used in connection with the identification, promotion, marketing, sale and distribution of any of the Products, other than trademarks or trade names owned by FRANCISCAN.   Such Trademarks shall include all Marks associated with any jointly developed products sold or branded under the RUFFINO name or another Trademark.

## Section 2.  APPOINTMENT AND SCOPE

A.      Appointment.   As of the Rights Date, RUFFINO hereby appoints FRANCISCAN as its exclusive importer to import, promote, market, sell and distribute the Products in the Territory during the Term, and FRANCISCAN accepts such appointment in accordance with and subject to the terms and conditions of this Agreement; including but not limited to Section 9(I) hereof.   Notwithstanding any contrary provision hereof, all of the respective rights and obligations of each of the parties relating to the importation, promotion, marketing, sale, distribution or purchase of the Products or the use of the Trademarks hereunder shall commence as of the Rights Date and thereafter shall continue for the remainder of the Term.   No implied rights or licenses are being granted under this Agreement by any party.

B.      Limitations on FRANCISCAN.   During the Term of this Agreement, unless RUFFINO shall otherwise consent in its sole discretion, FRANCISCAN shall obtain the Products for resale only from RUFFINO, and shall not directly or indirectly promote, market, sell or otherwise distribute the Products outside of the Territory or for resale or redistribution outside of the Territory.

C.      New Products in the Territory.   In the event that RUFFINO desires to introduce new products to the Territory, such product shall first be offered to FRANCISCAN.   If FRANCISCAN does not elect in writing within thirty (30) days to assume the distribution of the proposed product, RUFFINO may appoint another importer in the Territory for such product (including all vintages and sizes and extensions of such product).   New sizes or vintages of existing Products shall not be considered "New Products" for these purposes.   In the event that a New Product bears the Trademark of a Product then being sold by FRANCISCAN, FRANCISCAN shall assume the distribution of such product as a Product hereunder.

D.      Withdrawal or Discontinuance of Products from Sale.   RUFFINO may, with the reasonable consent or upon the recommendation of FRANCISCAN, withdraw permanently any Products, or sizes, varietals or types thereof, from import and sale in the Territory, upon a reasonable schedule mutually agreed to by the parties.   RUFFINO also may permanently discontinue the production of any Products, or sizes, varietals or

4



types thereof, upon one (1) year written notice to FRANCISCAN, provided that RUFFINO and FRANCISCAN shall discuss such proposed discontinuance in good faith prior to any notice of discontinuance by RUFFINO. RUFFINO also may withdraw or discontinue any Products, or sizes, varietals or types thereof, if, when and to the extent required by applicable law or the involuntary order of a court or government agency of competent jurisdiction.   Such withdrawn or discontinued Products shall thereafter no longer be "Products" for purposes hereof.

E.    Jointly Developed Products.   All jointly developed products sold or branded primarily under the RUFFINO name or any of the Trademarks, whether produced within or outside of the Territory, and all intellectual property rights therein, shall be the sole and exclusive property of RUFFINO, its successors or permitted assigns. All jointly developed products sold or branded primarily under the FRANCISCAN name or any of its trademarks, and all intellectual property rights therein, shall be the sole and exclusive property of FRANCISCAN, its successors or permitted assigns.   The parties will cooperate in taking reasonably requested actions to confirm the ownership of such rights in the relevant party.

## Section 3. PURCHASE TERMS

A.    Purchase.  FRANCISCAN shall use commercially reasonable efforts to order the Products from RUFFINO by written purchase order at least thirty (30) days prior to the requested shipment date. All orders shall be legally binding offers and shall be subject to acceptance and confirmation by RUFFINO.   During the Term of this Agreement, subject to the availability of Products, RUFFINO shall use its commercially reasonable efforts to accept FRANCISCAN's purchase orders and to comply with FRANCISCAN's requested shipment dates. RUFFINO shall use commercially reasonable efforts to advise FRANCISCAN in advance of any inability to make full and timely delivery of any Products ordered by FRANCISCAN.   No purchase order shall be considered accepted until specifically accepted in writing by RUFFINO or actually shipped. For all purposes of this Agreement, the term "shipment date" shall be the date the Products are delivered into the possession of a common carrier at the RUFFINO winery, ex-cellars Pontassieve (FI), Italy within the meaning of Incoterms 2000.  If there is any inconsistency between this Agreement and any individual purchase order or invoice or similar communication, the terms of this Agreement shall prevail. Any terms and conditions contained in such purchase order or invoice or communications which are in addition to the terms of this Agreement shall not be binding unless expressly agreed to in writing by both of the parties.

B.    Export Sales Prices.

(i)    The export sales prices for the Products shall be those prices established by RUFFINO from time to time in its sole discretion at all times. The initial prices for the Products are set forth at Exhibit B attached hereto and incorporated herein. All sales to and purchases of Products by FRANCISCAN shall be at the export sales

5



716 218 6216

prices in effect on the requested shipment date for such Products; provided further that during the period following notice of a price increase from RUFFINO and prior to the effective date of such price increase, FRANCISCAN may order from RUFFINO, at the lower price, up to but not more than, fifteen percent (15%) of the case volume of each Product stock-keeping unit (SKU) subject to the price increase that was purchased by FRANCISCAN from RUFFINO during the immediately preceding twelve (12) calendar month period (or, during the first Contract Year, from Schieffelin during 2004).

(ii)     The decision to change any export sales prices to FRANCISCAN is in the sole discretion of RUFFINO.   Subject to the foregoing, if RUFFINO desires to increase prices of the Products sold to FRANCISCAN, RUFFINO and FRANCISCAN shall discuss such proposed increase in good faith prior to the new price becoming effective.  In their discussions the parties shall take into consideration such elements as the market conditions in the Territory, currency exchange rates, costs, duties, taxes, the margin needs of the respective parties, the competitive position of the Products and such other elements as may be appropriate.   No prior consultation is required in the event of a price reduction.

(iii)     RUFFINO shall provide FRANCISCAN prior written notice of annual price changes for the Products on or before 1 November of each Contract Year, so that the information may be used in the creation of the Marketing Plan, as defined below, for the next Contract Year.  Such annual price changes will become effective at the beginning of such Contract Year on 1 January.   RUFFINO also may provide FRANCISCAN prior written notice of interim price changes for the Products at any time during the period from 1 January to 30 June of each Contract Year, to be effective sixty (60) days from the date of such notice but no later than 31 August of such Contract Year.   No other price changes proposed by RUFFINO to FRANCISCAN shall be effective until FRANCISCAN believes, in its reasonable commercial judgment, that such increase can be introduced into the market.

(iv)     All sales by RUFFINO shall be ex-cellars Pontassieve (FI), Italy, within the meaning of Incoterms 2000; and title to, and all risk of loss of, the Products shall pass to FRANCISCAN at that time.  For the avoidance of doubt and without limiting the foregoing, FRANCISCAN shall be solely responsible for all freight and shipping costs, all non-Italian excise taxes, all value added (VAT) or sales and use taxes (if any), and all import and export fees, customs duties and similar fees and charges, then imposed by the then applicable law of the relevant jurisdiction.   Unless FRANCISCAN is otherwise subject to the jurisdiction of the tax or customs regime of Italy, FRANCISCAN shall pay only such taxes and impositions as are assessed by the Italian government on ex-cellars sales.  Any other taxes required to be charged by RUFFINO at the point of sale, if any, shall be separately stated on the invoice.

C.     Franciscan Right to Resell.  Subject to the extraterritorial restrictions set forth in this Agreement, FRANCISCAN shall have the right to resell the Products hereunder at such prices and to such customers in the Territory as FRANCISCAN shall,

6



716 218 6216

in its sole discretion, deem appropriate. RUFFINO acknowledges and agrees that any increase in export sales prices may be reflected in a price increase by FRANCISCAN to its customers in the Territory and may, therefore, affect the volume of sales of the Products in the Territory.

D.    Payment Terms. Each shipment of Products shall be accompanied by an invoice or invoices, stating the amounts owed. FRANCISCAN shall pay for all purchases of Products in full pursuant to this Agreement within sixty (60) days from the date of invoice. All payments shall be in U.S. Dollars in cleared funds by bank wire transfer to RUFFINO, without any withholdings or credits or deductions. Without limiting any other rights or remedies of RUFFINO, all past due amounts shall bear interest at the lesser of (a) the highest lawful interest rate under applicable law, or (b) twelve percent (12%) per annum from the due date until the date of payment.

E.    No Setoffs. Notwithstanding any contrary provision of this Agreement, FRANCISCAN shall have no right to and shall not withhold or setoff or otherwise deduct from any of its payment or other financial obligations to RUFFINO any asserted claims or damages or other amounts of any kind, whether or not under this Agreement. The parties intend that this provision shall be an express limitation of remedies pursuant to Section 2-719 of the Uniform Commercial Code or any similar statute as enacted in any relevant jurisdiction.

## Section 4. NON-MERCHANTABLE PRODUCTS

A.    Right to Reject. FRANCISCAN shall be entitled, within six (6) months of receipt of Products at FRANCISCAN's warehouse or receipt of direct shipment at FRANCISCAN's wholesaler's warehouse, as the case may be, to reject Products that it reasonably determines are not of merchantable quality, if the defect is patent. If the defect is latent, notice must be given to RUFFINO within three (3) months of FRANCISCAN learning of the defect. Any claims not within such time periods are waived. Any defective or nonconforming Products shall be held for prompt inspection by RUFFINO. FRANCISCAN acknowledges and agrees that it shall be solely responsible for all stock rotation of the Products.

B.    Disputes. If there is a dispute between RUFFINO and FRANCISCAN as to the merchantability of a Product or the cause of any non-merchantability, an independent analysis shall be procured by FRANCISCAN from Scott Laboratories in San Rafael, California. If such analysis determines that the Products are not of merchantable quality and that the defect was due to the fault of RUFFINO, RUFFINO shall bear the costs of such analysis. FRANCISCAN otherwise shall bear the costs of such analysis.

C.    Defects Not the Fault of Ruffino. Notwithstanding any contrary provision hereof, neither RUFFINO nor its Affiliates shall be at fault or liable for any defects, alterations, modifications, conditions or problems of any kind attributable to

7



716 218 6216

acts or omissions of FRANCISCAN or any of its common carriers, employees, agents, Affiliates, distributors, customers or any third persons. Breakage or damage occurring during shipment (such as broken bottles or label stains or tampering) is the sole responsibility of the common carrier or freight handler or FRANCISCAN, and will not be credited or adjusted by RUFFINO.

D.     Procedures.   If the Products are defective or nonconforming due to the fault of RUFFINO, RUFFINO at its option may repurchase or credit FRANCISCAN at the invoiced cost thereof, plus reasonable handling charges, or replace such defective or nonconforming Products.   FRANCISCAN shall not return any Products without the prior written authorization of RUFFINO.   In the event that RUFFINO recalls any Products, FRANCISCAN shall fully cooperate with such recall and comply with all reasonable instructions of RUFFINO.

E.     Destruction of Products.   If specifically authorized in writing by RUFFINO, FRANCISCAN shall destroy the defective Products.   All costs for the destruction of Products that are defective due to the fault of RUFFINO shall be paid by RUFFINO.   FRANCISCAN's request for credit in the event of the destruction of Products must include the applicable signed and dated affidavit of destruction setting out the Products, size and case quantity destroyed.   The destruction shall be carried out in compliance with all applicable laws.

F.     Customer Complaints.   FRANCISCAN shall promptly notify RUFFINO of any material and legitimate customer complaints made in connection with any Product sold in the Territory.   FRANCISCAN shall make reasonable attempts to resolve or settle such complaints to the satisfaction of those concerned, if requested by RUFFINO and with such resolution or settlement subject to the reasonable prior written approval of RUFFINO.   All costs of such resolution or settlement shall be paid by RUFFINO to the extent the problem was due to the fault of RUFFINO.

G.     Exclusive Remedies.   Notwithstanding any contrary provision of this Agreement, including but not limited to Section 12 hereof, this Section 4 sets forth the exclusive remedies of FRANCISCAN for any defective or nonconforming Products or other claims of non-merchantability, other than for any claims arising out of the personal injury or death of any individual or damage to other property of a third party. All payments to be made, or credits to be issued, by RUFFINO under this Section shall be promptly paid or granted to FRANCISCAN.

Section 5.   OBLIGATIONS OF FRANCISCAN

A.     Sales Promotion; "Equal Nations" Efforts.   At all times during the Term, FRANCISCAN shall exercise its efforts to promote and maximize the sales and distribution of all of the Products in the Territory on an equal basis with those efforts FRANCISCAN normally devotes to its other wine products; provided that without limiting the foregoing, FRANCISCAN at all times shall exercise no less than



8

DEC-03-2004  09:20        CANANDAIGUA BRANDS ▲                    716 218 6216      P.10

716 218 6216

commercially reasonable efforts to promote and maximize such sales and distribution of all of the Products in the Territory.

B.    Marketing Plans.

(i)    RUFFINO shall advise FRANCISCAN of its brand objectives and the parties shall jointly devise, annually, a marketing plan ("Marketing Plan") which addresses the following matters, among others: (a) a forecast of annual purchase and depletion targets, based on the philosophy that FRANCISCAN's shipments of Products to its wholesalers should be equal to the wholesalers' depletions of the Products; (b) brand and packaging matters; and (c) pricing, advertising and promotion strategies, and the parties' respective shares of the costs associated therewith. FRANCISCAN undertakes and agrees that, during each Contract Year, it will expend from its funds a minimum of Five Million Five Hundred Thousand Dollars (US $5,500,000) on the advertising and promotion of the Products in the Territory, based on projected sales by FRANCISCAN in the Marketing Plan in the range of 580,000 cases in such Contract Year; with such minimum subject to adjustment based on a principle of rough proportionality in the event a lower range of sales is projected for such Contract Year.

(ii)    The proposed Marketing Plan shall be prepared annually by FRANCISCAN with respect to the next following Contract Year, and presented to RUFFINO for review with the objective that it be negotiated in good faith and agreed by the parties on or before 15 November of the Contract Year prior to which it is to become effective.    All such forecasts shall represent the reasonable and good faith estimates of FRANCISCAN for the period of the Marketing Plan. Such Marketing Plan shall not be binding on either party and is intended solely to assist RUFFINO and FRANCISCAN in their respective planning for production, importation, promotion, marketing, sale and distribution of the Products; subject however to the rights of RUFFINO provided in Section 13 hereof (Term and Termination).    The initial Marketing Plan has been agreed by the parties and is attached hereto and incorporated herein as Exhibit C.    In the event that the parties fail to mutually agree hereunder on a Marketing Plan for the then pending Contract Year, then the Marketing Plan for the then current Contract Year shall remain in force and effect as if adopted for such pending Contract Year.

(iii)    (a)    The relevant Marketing Plan shall provide that FRANCISCAN obtains a maximum Contribution After Marketing Amount of eight percent (8%) on its gross invoiced sales of all Products sold in the Territory during the Contract Year ending 31 December 2005, and a maximum Contribution After Marketing Amount of ten percent (10%) on its gross invoiced sales of all Products sold in the Territory during each Contract Year thereafter.    For purposes hereof, the term "Contribution After Marketing Amount" shall be defined as the total of such gross invoiced sales of all Products sold in the Territory during the relevant Contract Year, less (x) all of the Laid-In Costs for such Products; and (y) all of the advertising and

promotion costs incurred by FRANCISCAN pursuant to the terms hereof during the relevant Contract Year.

(b)    Any amount of Contribution After Marketing Amount derived by FRANCISCAN in excess of the foregoing percentage amounts shall be shared equally between the parties as a form of reallocation or reimbursement of costs. Any amount payable to RUFFINO as a result hereof shall be calculated and paid within ninety (90) days of the end of the Contract Year to which such payment relates, along with delivery to RUFFINO of a written computation of such amount.

(c)    Notwithstanding    the    foregoing    to    the    contrary, FRANCISCAN is absolutely free to set its resale prices for the Products in its sole and unreviewable discretion.

(iv)    (a)    Without limiting any other obligations of FRANCISCAN hereunder, during the Contract Years commencing 1 January 2005 and 1 January 2006 respectively, FRANCISCAN shall order from RUFFINO sufficient quantities of the Products to ensure that RUFFINO receives at least US $ 15,250,253 from the sale of Products to FRANCISCAN for the six-month period commencing 1 January 2005 and ending 30 June 2005 (the "Initial 2005 Period"); at least US $ 21,059,887 from the sale of Products to FRANCISCAN for the six-month period commencing 1 July 2005 and ending 31 December 2005; and at least US $ 36,310,150 from the sale of Products to FRANCISCAN for the Contract Year commencing 1 January 2006 and ending 31 December 2006 (collectively the "Initial Commitments").

(b)    For purposes of the foregoing, (x) the purchase by FRANCISCAN of any existing inventory of Products from Schieffelin or its Affiliate or assign shall not be credited against any part of the Initial Commitments; and (y) the purchase by Schieffelin of additional Products from RUFFINO on or after 1 January 2005 pursuant to the terms of the Schieffelin Agreement, if any, shall be credited against the obligations of FRANCISCAN hereunder for the Initial 2005 Period. Also for purposes of the foregoing, the designated shipment dates in any Product order shall be no later than thirty (30) days following the end of the relevant Contract Year or the relevant six-month period within a Contract Year, as the case may be.

(v)    FRANCISCAN acknowledges that RUFFINO attaches great importance to its Trademarks and brand image. FRANCISCAN shall, therefore, submit to RUFFINO, prior to use, all advertising and promotional materials to be created, and used, by FRANCISCAN (including brochures, scripts, layouts or concepts and other promotional materials to be created by FRANCISCAN in respect to any advertising media to advertise or promote the Products). RUFFINO shall promptly review the submitted materials and advise FRANCISCAN in writing of its acceptance or rejection thereof. If FRANCISCAN has received no notice of acceptance or rejection of such materials from RUFFINO within ten (10) business days of receipt, FRANCISCAN shall be entitled to deem such materials approved and to use such materials in accordance



10

716 218 6216

with this Agreement. If RUFFINO rejects the submitted materials it shall discuss the matter with FRANCISCAN and the parties will try to reach an acceptable alternative solution in good faith. In all events FRANCISCAN shall not use materials that are unacceptable to RUFFINO; and FRANCISCAN shall not publish or cause or permit to be published any statement or advertising relating to RUFFINO or the Products or the Trademarks or otherwise engage in conduct that may mislead or deceive the public, or impair or dilute the goodwill of RUFFINO, the Products or the Trademarks.

(vi)    FRANCISCAN shall not offer or make any additional or different or supplemental warranties or representations of any kind regarding the Products.

(vii)    Each of the parties acknowledges and agrees and admits that none of the Marketing Plans or other plan or program for the Products are or shall be deemed to be a marketing plan or system prescribed or suggested in substantial part by RUFFINO; and that neither this Agreement nor any relationship or rights between the parties shall constitute or be interpreted or construed as a "franchise" under any applicable law.

C.    Inventory. In addition to its other obligations hereunder, FRANCISCAN shall maintain adequate stocks of the Products in temperature-controlled warehouses, to facilitate the prompt and effective distribution of the Products, and to properly service the needs of wholesalers and retailers in the Territory.

D.    Reporting. FRANCISCAN shall provide to RUFFINO monthly reports prepared in the ordinary course of FRANCISCAN's business regarding the Products. Such reports shall include monthly depletions, FRANCISCAN warehouse inventory levels, major markets' performance, FRANCISCAN's performance against the Marketing Plan, advertising and promotion expenditure summaries, and comparative reports against prior periods, and such other information as is available to FRANCISCAN and which FRANCISCAN believes may be of interest to RUFFINO. The back-up documentation relating to such reports shall be maintained by FRANCISCAN in conformance with its then general corporate document retention policies. Upon RUFFINO's reasonable request with twenty-one (21) days prior notice, FRANCISCAN shall provide RUFFINO copies of back-up documentation available to FRANCISCAN.

E.    Compliance with Applicable Laws. During the Term FRANCISCAN shall comply with all applicable laws and regulations pertaining to the exporting, importing, labeling, packaging, marketing, advertising, promotion, sale, distribution and other disposition of the Products in the Territory. FRANCISCAN shall be responsible for securing all permits, licenses and approvals required by all governmental authorities to export and import the Products and promote market, sell, distribute and otherwise dispose of the Products in the Territory. FRANCISCAN shall reasonably advise RUFFINO of any relevant laws or regulations or changes in the Territory that affect the production, labeling or packaging of the Products or other activities in the Territory



11

716 218 6216

under this Agreement, RUFFINO shall cooperate with FRANCISCAN in obtaining any necessary permits, licenses and approval in the Territory at the cost of FRANCISCAN.

F.    No Competing Brands.   During the Term of this Agreement, FRANCISCAN shall not, directly or indirectly through one or more intermediaries import or promote or market or sell or distribute or represent or otherwise dispose of any brands or products of Italian wine of any kind within the Territory at any time, other than the Products hereunder.   Any Affiliates of FRANCISCAN distributing Italian wine must maintain wholly separate and independent sales and marketing forces from those of FRANCISCAN at all times during the Term, other than in the case of occasional sales by such Affiliates to special channels of distribution in the Territory that do not in the aggregate represent a substantial part of the Products sold or distributed hereunder in any Contract Year.

G.    Sales Force.   FRANCISCAN shall maintain a qualified sales force to promote the sales of the Products throughout the Territory.   Such sales force shall be kept properly informed as to all advertising, marketing and promotional programs and policies regarding the Products.

H.    Change of Control Notice.   FRANCISCAN shall promptly notify RUFFINO in writing of any Change of Control of FRANCISCAN or its direct or indirect parent or permitted assign as herein further provided.

Section 6. OBLIGATIONS OF RUFFINO

In addition to its other obligations hereunder, RUFFINO shall provide FRANCISCAN with reasonable advance written notice of any changes in the availability of any Products.

Section 7. CONFIDENTIALITY

Prior to and during the Term of this Agreement, the parties will disclose certain Confidential Information to the other in order to permit such other party to perform its obligations under this Agreement.   During the Term of this Agreement and thereafter, each party shall maintain the confidentiality of the other party's Confidential Information and shall not use, sell, or disclose in any manner, directly or indirectly, such Confidential Information, except as expressly set forth herein; provided however that this obligation shall not apply to information that: (i) was already rightly known to the receiving party at the time of the first disclosure; (ii) comes into the public domain without breach of confidence by the receiving party or any other third party; (iii) was obtained by the receiving party from a third party without restrictions on its disclosure or use in favor of the disclosing party, whether by law or contract; or (iv) is required to be disclosed pursuant to any statutory or regulatory provision or involuntary court order under applicable law; provided however that the receiving party shall use reasonable efforts to give advance notice of such compelled disclosure to the other party, and shall cooperate with the other party in connection with any efforts to prevent or limit the



12



716 218 6216

scope of such disclosure and/or use of the Confidential Information.  In each case the receiving party making the disclosure shall have the burden of establishing any of the foregoing exceptions.  "Confidential Information" shall mean all data and information of a confidential nature relating to the Products and/or the business or affairs of RUFFINO or FRANCISCAN, as the case may be, including, but not limited to, information relating to the Products and Product recipes, manufacturing processes, customers and markets, corporate structure and organization and other technical data, marketing material, business strategies, pricing strategies, trade secrets and proprietary information.  Confidential Information may be communicated orally, visually, in writing or in any other recorded or tangible form.  Data and information shall be considered to be Confidential Information hereunder (x) if either party has marked it as such, (y) if either party has advised the other party of its confidential nature in writing or orally, provided such oral information is reduced to a writing within 30 days, or (z) if, due to its character or nature, a reasonable person in a like position and under like circumstances as FRANCISCAN or RUFFINO would treat as confidential.  All files, lists, records, documents, charts, drawings, specifications and computer programs which incorporate Confidential Information shall remain the property of the disclosing party.  Such materials shall be promptly returned upon the earlier of the owner's reasonable request; or the termination of this Agreement.  Notwithstanding any of the foregoing to the contrary, (a) all depletion reports, sales volume reports, inventory levels, and on-and-off premises account sold data provided by FRANCISCAN to RUFFINO under this Agreement, and (b) the identities of the wholesale distributors or resellers for the Products in the Territory, shall be deemed to be part of the Confidential Information of RUFFINO irrespective of the source, and may be used and disclosed by Ruffino or any of its Affiliates or representatives in any manner determined in the sole discretion of RUFFINO.  The parties expressly acknowledge that the covenants contained herein are unique and integral to this Agreement and that monetary damage would be an inadequate remedy at law in the event of a breach.  For that reason, the parties consent that such covenants shall be enforceable in a court of equity by temporary or permanent injunction, restraining order or a decree of specific performance.  The remedies provided above shall be cumulative and not exclusive and are in addition to any other remedies which either party may have under this Agreement or applicable law.

## Section 8.  REPRESENTATIONS AND WARRANTIES OF FRANCISCAN

FRANCISCAN represents and warrants to RUFFINO:

A.      FRANCISCAN has the authority to enter into and carry out its obligations under this Agreement.

B.      FRANCISCAN holds, and shall maintain during the Term, all necessary licenses or permits under applicable law that are materially necessary to conduct its business as the importer of the Products and to engage in the transactions intended by this Agreement.



13



716 218 6216

C.      FRANCISCAN shall conduct its activities under this Agreement in accordance with all applicable laws and regulations regarding the exporting, importing, promotion, marketing, sale, distribution and other disposition of the Products.

D.      FRANCISCAN shall monitor wholesaler inventories of the Products to ensure that quantities are adequate to service the requirements of the markets in the Territory.    FRANCISCAN shall promptly deliver, or arrange for direct import shipments of, the Products to its customers in the Territory in accordance with good business practice and local custom.

E.      The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not constitute a breach of any agreement or understanding to which FRANCISCAN is a party.

Section 9. REPRESENTATIONS AND WARRANTIES OF RUFFINO

RUFFINO represents and warrants to FRANCISCAN:

A.      RUFFINO has the authority to enter into and carry out its obligations under this Agreement.

B.      The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not constitute a breach of any agreement or understanding to which RUFFINO is a party.

C.      RUFFINO has the right, as of the Effective Date, to designate and appoint FRANCISCAN as the exclusive importer of the Products in and for the Territory.

D.      The Products, when they leave RUFFINO's care and control ex-cellars Pontassieve (FI), Italy, shall fully conform to all applicable Italian, European and United States laws and regulations governing their production and labeling, shall be of merchantable quality and fit for human consumption as wine or grappa or olive oil (as the case may be), in completely saleable condition, and shall not constitute items which may not be introduced into commerce under the U.S. Food, Drug and Cosmetics Act. RUFFINO, at FRANCISCAN's request, shall furnish reasonable samples of the Products, and all shipments of the Products shall conform in all material part to any samples provided.    Section 4(G) hereof sets forth the exclusive remedies for any defective or nonconforming Products or other claims of non-merchantability, other than for any claims arising out of the personal injury or death of any individual or damage to other property of a third party.

E.      The Products sold to FRANCISCAN shall be free and clear of any liens or encumbrances.    Neither the execution of this Agreement, nor compliance with its



14

DEC-03-2004  09:24          CANANDAIGUA BRANDS ▲          716 218 6216     P.16

716 218 6216

terms, will result in the creation nor imposition of any lien, charge, encumbrance or restriction of any nature by any third party upon the Products sold to FRANCISCAN.

F.      RUFFINO shall maintain an adequate inventory of the Products with which to supply FRANCISCAN, consistent with the Marketing Plan for the relevant Contract Year.

G.      RUFFINO shall not sell or otherwise transfer any of the Products to any customer outside the Territory whom RUFFINO knows, or has reason to believe, will, either directly or indirectly, sell or otherwise transfer the Products into the Territory; excluding duty free shops located outside of the Territory unless RUFFINO knows that the subject Products will be transferred to duty free shops in the Territory.

H.      RUFFINO represents and warrants that it has the exclusive and unrestricted right to use the Trademarks as applied to the Products in the Territory.

I.      Notwithstanding any contrary provision of this Agreement and for the avoidance of doubt, the representations and warranties of RUFFINO and the appointment of FRANCISCAN as the importer for RUFFINO each shall be qualified and limited by any rights or claims or actions (if any exist) as may be asserted by Schieffelin or its Affiliate or assign arising out of (i) any dealings or relationships with such entity; or (ii) the termination of any such dealings or relationships; or (iii) the importation, promotion, marketing, sale, distribution or other disposition of any of the Products into or in the Territory or any expectation or claim or right to participate in any of the foregoing (collectively "Importer Claims"); provided however that RUFFINO does not intend to and does not make in this Agreement any admission of law or fact or waive any rights or remedies with respect to any Importer Claims, and all such rights and remedies are hereby expressly reserved.

J.      THE EXPRESS REPRESENTATIONS AND WARRANTIES IN THIS SECTION 9 ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER REPRESENTATIONS OR WARRANTIES OF RUFFINO OR ANY AFFILIATE, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT AND ALL WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE, ALL OF WHICH ARE HEREBY DISCLAIMED.

Section 10. PRODUCT LIABILITY

During the Term of this Agreement, RUFFINO shall maintain in full force and effect general liability insurance with product liability and hazard coverage regarding the sale of the Products by FRANCISCAN in the Territory in an amount of not less than five million dollars ($5,000,000) aggregately and one million dollars ($1,000,000) for single accident occurrence.   Such insurance shall contain a broad form vendor's



15



716 218 6216

endorsement inuring to the benefit of FRANCISCAN. RUFFINO shall, on an annual basis during the Term, furnish to FRANCISCAN a certificate confirming such coverage.

## Section 11. TRADEMARKS

A.    RUFFINO hereby grants to FRANCISCAN a non-exclusive, non-assignable, non-transferable license to use the Trademarks in the Territory for the Term of this Agreement for the limited purpose of the marketing, promotion, sale and distribution of Products in the Territory, subject to the following:

(i)    FRANCISCAN shall use the Trademarks only in connection with the sale, marketing, promotion and distribution of Products in the Territory hereunder;

(ii)   All uses of the Trademarks shall reproduce faithfully the design and appearance of the Trademarks as represented in or on the labels and packaging or as otherwise provided by RUFFINO; .

(iii)  FRANCISCAN shall have no right to sublicense to any person the right to reproduce the Trademarks for any purpose, except in connection with the production of approved promotional or advertising materials; and

(iv)   FRANCISCAN expressly agrees that the Trademarks and all associated copyrights are and shall be the sole and exclusive property of RUFFINO and that FRANCISCAN neither shall make a claim nor assert any right to, or interest in, the Trademarks or such copyrights during or after the Term of this Agreement, except the right to limited non-exclusive use in accordance with the foregoing provisions during the Term. All use of the Trademarks, and all goodwill associated with such use, shall inure to the benefit of RUFFINO.

B.    The parties agree to cooperate with preparation and filing of any applications, renewals or other documentation necessary or useful to protect the Trademarks in the Territory. FRANCISCAN shall notify RUFFINO promptly of any actual or threatened infringements of the Trademarks of which FRANCISCAN becomes aware. RUFFINO shall have the sole right, though it is under no obligation, to bring any action for any infringements of its rights in the Trademarks utilizing counsel of its choosing, and shall manage any such dispute. FRANCISCAN shall cooperate with RUFFINO in any efforts by RUFFINO to enforce its rights in the Trademarks or to prosecute third person infringers of the Trademarks in the Territory; and RUFFINO shall promptly reimburse FRANCISCAN for any reasonable out-of-pocket costs incurred by FRANCISCAN at the request of RUFFINO in connection with such efforts. The parties shall allocate in a fair manner any and all damages and other monies awarded or otherwise paid in connection with any such action.

16

DEC-03-2004  09:26          CANANDAIGUA BRANDS ▲                716 218 6216      P.18

716 218 6216

## Section 12. INDEMNIFICATION; EXCLUSIONS

A.    Indemnification by RUFFINO.   RUFFINO shall indemnify and defend and hold harmless FRANCISCAN, its officers, directors, employees, agents, Affiliates including its direct parent stockholder, representatives, successors and permitted assigns in such capacities ("FRANCISCAN Indemnified Parties"), from and against any and all actual or threatened demands, claims, actions, causes of action, liabilities, losses, damages, judgments, settlements, costs or expenses of any kind or nature, including reasonable attorneys' fees and other costs of legal defense (collectively "Losses"), which the FRANCISCAN Indemnified Parties, or any of them, may sustain or incur as a result of (i) the breach of any representation or warranty of RUFFINO contained herein; or (ii) the breach of any covenant or agreement required to be performed by RUFFINO under this Agreement, but excluding any Losses for which CBI or Constellation or their respective Affiliate or successor or assign is obligated to indemnify RUFFINO or any of the RUFFINO Indemnified Parties under the QPA or the Quotaholders Agreement or any other express written agreement between or among the parties or their respective Affiliates.  For the avoidance of doubt, no distributor or other reseller of the Products shall be deemed to be an agent or representative or successor or permitted assign of FRANCISCAN.

B.    Indemnification by FRANCISCAN.   FRANCISCAN shall indemnify and defend and hold harmless RUFFINO, its officers, directors, direct shareholders and direct quotaholders, employees, agents, Affiliates, representatives, successors and permitted assigns in such capacities ("RUFFINO Indemnified Parties"), from and against any and all actual or threatened Losses, which the RUFFINO Indemnified Parties, or any of them, may sustain or incur as a result of (i) the breach of any representation or warranty of FRANCISCAN contained herein; (ii) the breach of any covenant or agreement required to be performed by FRANCISCAN under this Agreement; or (iii) any and all claims or actions of any distributors or other resellers of the Products within the Territory, excluding any claims arising out of the personal injury or death of any individual or damage to other property of a third party from defective Products due to the fault of RUFFINO.

C.    Additional Terms.   The Indemnified Party or Parties shall promptly notify the indemnifying party of any Losses for which indemnification is sought, provided however that the failure to give such notice shall not relieve any indemnification obligations hereunder except and only to the extent that the indemnifying party was materially prejudiced by such failure.  The Indemnified Party may participate and appear at its own expense on an equal footing with the indemnifying party in the defense of any Losses hereunder. The Indemnified Party shall not settle or concede or compromise any Loss without the prior written approval of the indemnifying party, which approval shall not be unreasonably withheld or delayed, The indemnifying party shall not consent to the entry of a judgment or with respect to the matter or enter into any settlement which does not include a provision whereby the plaintiff or claimant in the matter releases all of the Indemnified Parties from all Losses

17



716 218 6216

with respect thereto, without the prior written approval of the other party hereto who is an Indemnified Party, which approval shall not be unreasonably withheld or delayed. The foregoing indemnification obligations are in addition to and shall not affect any other indemnification obligations under the QPA or the Quotaholders Agreement or any other agreement between or among the parties or their Affiliates.

D.    No Consequential Damages.    NOTWITHSTANDING THE FOREGOING OR ANY CONTRARY PROVISION OF THIS AGREEMENT OR ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON UNDER ANY THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, NEGLIGENCE, STATUTE, INDEMNITY OR OTHERWISE) FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, HOWEVER CAUSED, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

## Section 13  TERM AND TERMINATION

A.    Term - Renewal.  This Agreement is effective as of the date first above written and, unless earlier terminated in accordance with this Section 13, shall terminate on 31 December 2014.   If, at that date, the Agreement has not been terminated previously pursuant to this Section 13, it shall be renewed automatically thereafter for successive ten (10) year terms, until and unless this Agreement is earlier terminated in accordance with this Section 13.

B.    Termination by Either Party.  This Agreement may be terminated by either party giving thirty (30) days advance written notice to the other in the event of the occurrence of any of the following: (i) the other party becomes insolvent; or (ii) bankruptcy or reorganization proceedings are initiated against or by the other party, or a receiver or similar officer is appointed for all or substantially all of the other party's assets or business, and such proceedings or appointment are not dismissed or stayed within ninety (90) days; or (iii) the other party provides for a general assignment of assets in favor of its creditors; or (iv) the commencement of the liquidation or dissolution of the other party.

C.    Termination for Material Breach.   Either party ("Notice Party") also may terminate this Agreement for cause by written notice of termination to the other party ("Defaulting Party") in the event the Defaulting Party breaches any of its material obligations or representations or warranties under this Agreement; provided that such written notice must declare such breach and describe such breach in reasonable detail and provided further that the Defaulting Party shall have sixty (60) days from the date of the written notice from the Notice Party to either fully cure such breach or to substantially cure such breach and thereafter diligently proceed to complete such cure.

13



716 218 6216

If any claimed breach is not cured within the applicable cure period, then upon expiration of such period this Agreement shall terminate.  Notwithstanding the foregoing to the contrary, such right to cure shall not be applicable to more than four (4) similar breaches in any twelve (12) month period during the Term.

D.    Termination by RUFFINO.  Notwithstanding any contrary provision of this Agreement and in addition to its other rights hereunder, RUFFINO further may terminate this Agreement by providing six (6) months' prior written notice of termination to FRANCISCAN in the event of either of the following:

(I)    FRANCISCAN fails to meet any of its Initial Commitments under Section 5(B)(iv) hereof; or

(ii)    Beginning with the Contract Year commencing 1 January 2007 and continuing until the end of the Term, FRANCISCAN fails to order from RUFFINO in any Contract Year sufficient quantities of the Products to ensure that RUFFINO receives at least seventy-five percent (75%) of the total gross revenues projected to be received by RUFFINO from all purchases of Products by FRANCISCAN from RUFFINO under the Marketing Plan for such Contract Year at the applicable export sales prices as set forth in the Marketing Plan;

and FRANCISCAN fails to cure such breach within sixty (60) days of receipt of the notice of termination from RUFFINO.  Notwithstanding the foregoing to the contrary, the right to cure shall not be applicable under Paragraph D(ii) to more than two (2) breaches in total during the Term or to breaches in consecutive Contract Years. Any notice of termination under this Paragraph D must be given by RUFFINO within sixty (60) days following the end of the relevant Contract Year, or the right to terminate hereunder for the specific breach shall be deemed waived.  If any claimed breach is not cured within the applicable cure period, then this Agreement shall terminate upon expiration of six (6) months from the date of the foregoing termination notice.   For purposes hereof, the requested shipment dates in any Product order shall be no later than thirty (30) days following the end of the relevant Contract Year or the relevant six-month period within a Contract Year, as the case may be; or in the case of any cure hereunder, no later than thirty (30) days from the date of the curing order hereunder.

E.    Additional Termination Rights.   In addition to the other rights of termination hereunder:

(i)    Either party further may terminate this Agreement upon six (6) months' prior written notice if Constellation or any of its Affiliates cease to own at least twenty-five percent (25%) of the then total outstanding equity shares of RUFFINO or its successor.

(ii)    RUFFINO further may terminate this Agreement upon sixty (60) days prior written notice in the event of (x) a Change of Control of FRANCISCAN or

19



716 218 6216

its direct or indirect parent or permitted assign; or (y) a Change of Control of Constellation as defined in the Quotaholders Agreement; or (z) any material breach by Constellation or CBI (or their respective successors or Affiliates or assigns) of any obligation to sell any part of its equity shares or to purchase the equity shares of others in RUFFINO or its successor pursuant to the terms of the Quotaholders Agreement.

F.   Period Following Notice of Termination.   Without limiting its other obligations under this Agreement, during the period following the issuance of a notice of termination hereunder, FRANCISCAN shall not directly or indirectly sell or distribute the Products at other than normal levels or otherwise in a manner that could damage the market for the Products or impair the goodwill of RUFFINO or the Products or the Trademarks.

G.   Effects of Termination.   Upon termination of this Agreement:

(i)   All orders placed by FRANCISCAN and accepted by RUFFINO but not delivered to FRANCISCAN's carrier shall be deemed canceled; and FRANCISCAN shall submit to RUFFINO a list of unsold Products in FRANCISCAN's possession as of the date of termination.  RUFFINO shall repurchase all the unsold merchantable Products at FRANCISCAN's Laid-In Cost plus shipping to RUFFINO or its designee, subject to the right of RUFFINO to credit against the repurchase price any then outstanding, undisputed and unpaid invoices for the Products.  FRANCISCAN shall then ship the unsold Products to the destination designated by RUFFINO.  Any non-merchantable Product shall be destroyed in compliance with applicable law, and any costs associated with such destruction, and FRANCISCAN's laid-in cost for such non-merchantable Products, shall be borne by RUFFINO but only if such non-merchantability was due to the fault of RUFFINO.   At RUFFINO's request and cost, FRANCISCAN shall return all promotional materials to RUFFINO or its designee.  If RUFFINO does not instruct FRANCISCAN as to the disposition of the promotional materials within thirty (30) days of the transfer of inventory, FRANCISCAN shall destroy such materials.

(ii)   FRANCISCAN shall cease to be the exclusive importer of the Products for the Territory, and all payment obligations of one party to the other shall be immediately accelerated.  All other rights and obligations of the respective parties under this Agreement shall cease; provided however that (x) all of the rights and obligations of the respective parties under Section 2(E) hereof (Jointly Developed Products), Section 3(E) hereof (No Setoffs), Section 4(G) hereof (Exclusive Remedies), Section 7 hereof (Confidentiality), Section 8 hereof (Representations and Warranties of Franciscan), Section 9 hereof (Representations and Warranties of Ruffino), Section 10 hereof (Products Liability), Section 11 hereof (Trademarks), Section 12 (Indemnification), this Section 13, and Section 1 (Definitions) and Section 14 to the extent applicable or useful for the interpretation or enforcement of this Agreement; and (y) any claims or actions or causes of action existing as of the date of termination, each shall not terminate and shall

20



DEC-03-2004  09:29      CANANDAIGUA BRANDS ▲                716 218 6216      P.22

716 218 6216

survive and remain in full force and effect until the relevant rights and obligations of the parties have been fully discharged and satisfied.

Section 14. MISCELLANEOUS PROVISIONS

A.   Force Majeure.   In the event of any circumstance or event beyond the control of a party hereto and in particular, but without prejudice to the generality of the foregoing, acts of God or the public enemy, fire, explosion, earthquake, lightning, storm, hurricane, typhoon, failure of public services, perils of the sea, flood, drought, war, riots, terrorist attacks, nuclear radiation or contamination, sabotage, accident, embargo, labor strikes or disputes; or government priority, requisition or allocation or other mandatory action by any government authority; or interruption of or delay in transportation, shortage or failure of supply of materials or equipment from normal sources for manufacture of the Products; or by compliance with any involuntary order of a court or government of competent jurisdiction or any offices, department, agency or committee thereof; but excluding any circumstance or event relating to any general national, international or regional economic or financial conditions or to the Italian wine market in the Territory generally, provided however that the parties agree that a specific, unforeseeable and catastrophic event that materially damages the overall market for Italian wines in the Territory shall be an event of force majeure hereunder (the foregoing collectively "Force Majeure"); then (except for claims for the payment of sums due under this Agreement) any delay or failure in the performance of the affected party hereunder by reason of such Force Majeure shall be excused for so long as and to the extent that such Force Majeure exists; provided that such party gives the other party prompt written notice of such Force Majeure and uses its reasonable efforts to limit the resulting delay or failure in its performance, and provided further that the failure to give prompt notice shall not be a breach hereunder unless the other party is materially prejudiced by such failure. If either party is unable to perform its respective obligations under this Agreement for a continuous period of sixty (60) days by reason of a Force Majeure, then both parties, in utmost good faith, shall enter into discussions with a view to agreeing on such adjustments as may be mutually acceptable to continue the operation of this Agreement.

B.   Relationship between the Parties.   RUFFINO and FRANCISCAN hereby agree that, in the performance of their respective obligations hereunder, they are and shall be independent contractors.   Nothing in this Agreement shall be construed: (i) to give either party the power to direct or control the daily activities of the other party, or (ii) to constitute the parties as principal and agent, employer and employee, franchisor and franchisee, partners, joint venturers, co-owners or otherwise as participants in a joint undertaking. Neither party shall have the power to bind the other party to any contract or the performance of any obligation of any kind, express or implied, to represent to any third party that it has any right to enter into any binding obligation on the other party's behalf, or transfer, release or waive any right, title or interest of the other party.

21



716 218 6216

    C.   Entire Agreement; Modifications.  This Agreement, together with its exhibits attached hereto, contains the entire agreement between the parties relating to the subject matter hereof, and supersedes any and all prior or contemporaneous agreements, understandings, representations or warranties, whether oral or written or express or implied; provided that for the avoidance of doubt the QPA, the Quotaholders Agreement, and that certain Schieffelin Inventory Purchase Letter and that certain Franciscan Appointment Letter entered into on even date hereof, shall not be affected or superseded by this Agreement.  The express terms of this Agreement control and supersede any course of performance or usage of the trade inconsistent with the terms hereof.  No changes or modifications of or additions to this Agreement shall be valid unless the same shall be in writing and signed by the party against which enforcement is sought.

    D.   Waivers.  No waiver of any of the provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver of any provision of this Agreement shall be binding on the parties hereto unless it is executed in writing by the party making the waiver.

    E.   Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing properly addressed to the recipient at the address from time to time communicated to the other party.  Notice shall be deemed to have been duly given on the date of delivery if delivered personally, or by telefacsimile with confirmation of receipt, to the party to whom notice is to be given.  Notice may also be given in writing sent by a recognized international overnight courier, in which case notice shall be effective on the date of delivery.  Either party may change the address to which notices to such party are to be addressed by giving the other party hereto written notice of such change in the manner herein set forth.

    F.   Governing Law.  This Agreement is made and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to the conflict of laws principles thereof, as the same apply to agreements executed solely by residents of New York, provided however that Incoterms 2000 shall govern where indicated.  This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is hereby expressly excluded.

    G.   Interpretation.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  When the context requires, the plural shall include the singular and the singular the plural.  Section headings are only for the convenience of the parties and are not part of this Agreement



716 218 6216

H.   <u>Time is of the Essence</u>.  Time is of the essence in this Agreement and all of the terms, covenants and conditions hereof.

I.   <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which when executed and delivered shall constitute an original, but all of which when taken together shall constitute one and the same document.

J.   <u>Assignment; Binding Effect</u>.  Notwithstanding any contrary provision of this Agreement, neither party shall assign, sell, transfer, delegate, sublicense, encumber or otherwise dispose of, whether voluntarily or involuntarily, and whether by merger or operation of law or otherwise (collectively "Assignment"), this Agreement or any of its rights or obligations under this Agreement to any other person (including but not limited to any Affiliate) without the prior written consent of the other party, which consent may be withheld in the sole and absolute discretion of such other party.   Any permitted Assignment shall not result in a novation of this Agreement, and the assigning party shall remain fully responsible for performance hereunder.  Any purported Assignment by a party, except as expressly permitted in this Subsection, shall be null and void and a material breach of this Agreement.   Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of RUFFINO and FRANCISCAN and their respective successors and permitted assigns.

K.   <u>Severability Clause</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, and the remainder of this Agreement shall remain in full force and effect.  In such event the relevant parties agree to amend and replace any invalid or illegal or unenforceable provision with a valid and legal and enforceable provision which most closely approximates the intent and economic effect of the invalid or illegal or unenforceable provision.

L.   <u>Good Faith and Fair Dealing</u>.   The parties recognize that portions of this Agreement are general in nature, and the parties acknowledge and agree that they shall operate in good faith and deal fairly with one another when interpreting and performing their respective obligations hereunder.

**[Signature Page to Follow]**

23



716 218 6216

IN WITNESS WHEREOF, the parties hereto have executed this Exclusive Importation Agreement as of the Effective Date.

**RUFFINO, S.r.l.**

By: _____

Name: MARCO FOLONARI

Title: CHAIRMAN

Date Signed: 3/12/04      3 dicembre 2004

**FRANCISCAN VINEYARDS, INC.**

By: _____

Name: RONALD C. FONOLLCOR

Title: VICE PRESIDENT, GENERAL COUNSEL + Assistant Secretary

Date Signed: 3 December 2004

24

716 218 6216

## EXHIBIT A

## PRODUCTS

## CORE PRODUCTS

Ruffino Chianti
Fonte Al Sole
Orvieto
Libaio
Aziano
Il Leo
Lumina
Ducale Tan
Ducale Gold
Modus
Grappa Riserva Ducale

## ESTATE COLLECTION

La Solatia
Santedame
Romitorio di Santedame
Lodola Nuova
Lodola Nuova Riserva
Greppone Mazzi
*Borgo Conventi Collio Pinot Grigio
*Borgo Conventi Collio Sauvignon
*Borgo Conventi Collio Chardonnay
*Borgo Conventi Collio Merlot

*The Borgo Conventi wines and associated Marks may be deleted from the list of Products and from the Trademarks at any time during the Term, at the election of RUFFINO.

25



716-218 6216

## EXHIBIT B

### INITIAL EXPORT SALES PRICES

| | NEW EX CELLARS |
|---|---|
| **RUFFINO RED WINES** | |

**ROMITORIO DI SANTEDAME**
    **Colorino/Merlot**
    **Toscana I.G.T.**
    **Vintage 2000**

| | |
|---|---|
| 39009 - case of 4 bottles x 3000 ml (each bottle in an individual wooded box) | 513.09 |
| 39007 - case of 6 bottles x 1500 ml (each bottle in an individual wooded box) | 333.45 |
| 39005 - wooden case of 6 bottles x 750 ml | 149.07 |

    **Vintage 2001**

| | |
|---|---|
| 39009 - case of 4 bottles x 3000 ml (each bottle in an individual wooded box) | 513.09 |

**GREPPONE MAZZI**
    **Brunello di Montalcino D.O.C.G.**
    **Vintage 1998**

| | |
|---|---|
| 37005 - wooden case of 6 bottles x 750 ml | 140.46 |

**MODUS**
    **Sangiovese/Cabernet Sauvignon/Merlot**
    **Toscana I.G.T.**
    **Vintage 1999**

| | |
|---|---|
| 10475 - wooden case of 6 bottles x 750 ml | 99.00 |

**NERO AL TONDO - Vintage**
    **Pinot Nero**
    **Toscana I.G.T.**

| | |
|---|---|
| 38005 - wooden case of 12 bottles x 750 ml | 155.25 |

| | NEW EX CELLARS |
|---|---|
| **RUFFINO RED WINES** | |

**RISERVA DUCALE GOLD LABEL**
    **Chianti Classico D.O.C.G.  Riserva -**

26



716 218 6216

**Special Selection**
**Vintage 1999**
30017 - wooden case of 6 bottles x 1500 ml          197.56
30015 - wooden case of 12 bottles x 750 ml          177.23
**Vintage 2000**
30019 - case of 4 bottles x 3000 ml (each bottle
    in an individual wooded box)               304.44


**RISERVA DUCALE**
   **Chianti Classico D.O.C.G. Riserva**
   **Vintage 2000**
   10989 - wooden case of 1 bottle x 5000 ml          79.29
   10979 - carton of 4 bottles x 3000 ml             208.24
   10977 - wooden case of 6 bottles x 1500 ml        105.28
   10975 - carton of 12 bottles x 750 ml             105.28
   10973 - carton of 24 bottles x 375 ml             111.96

**LODOLA NUOVA  -  Vintage**
   **Vino Nobile di Montepulciano D.O.C.G.**
   11375 - carton of 12 bottles x 750 ml              93.77

**LODOLA NUOVA Reserva  -  Vintage**
   **Vino Nobile di Montepulciano D.O.C.G.**
   **Riserva**
   xx   -  carton of 12 bottles x 750 ml              96.11

**SANTEDAME  -  Vintage**
   **Chianti Classico D.O.C.G.**
   11275 - carton of 12 bottles x 750 ml              79.86

**AZIANO  -  Vintage**
   **Chianti Classico D.O.C.G.**
   11075 - carton of 12 bottles x 750 ml              61.89

**NEW**
**RUFFINO RED WINES**     **EX CELLARS**

**IL LEO  -  Vintage**
   **Chianti Superiore D.O.C.G.**
   10185 - carton of 12 bottles x 750 ml              48.09

**CHIANTI D.O.C.G.  -  Vintage**
   10147 - carton of 6 bottles x 1500 ml              37.60
   10175 - carton of 12 bottles x 750 ml             43.59



716 218 6216

| | |
|---|---|
| 10173 - carton of 24 bottles x 375 ml | 54.83 |

**FONTE AL SOLE - Vintage**
 Sangiovese/Merlot
 Toscana I.G.T.

| | |
|---|---|
| 19195 - carton of 12 bottles x 750 ml | 40.54 |

**NEW
EX CELLARS**

## RUFFINO WHITE WINES

**LA SOLATIA**
 Chardonnay
 Toscana I.G.T.
 Vintage 2000

| | |
|---|---|
| 10575 - wooden case of 6 bottles x 750 ml | 52.72 |

**LIBAIO - Vintage**
 Chardonnay
 Toscana I.G.T.

| | |
|---|---|
| 13475 - carton of 12 bottles x 750 ml | 50.12 |

**ORVIETO CLASSICO D.O.C. - Vintage**

| | |
|---|---|
| 12677 - carton of 6 bottles x 1500 ml | 33.05 |
| 12675 - carton of 12 bottles x 750 ml | 32.68 |

 Abboccato - Vintage

| | |
|---|---|
| 12775 - carton of 12 bottles x 750 ml | 32.68 |

## LUMINA - FRIULI
### White Wines

**NEW
EX CELLARS**

**LUMINA - Vintage**
 Pinot Grigio
 Venezia Giulia I.G.T.

| | |
|---|---|
| 19715 - carton of 12 bottles x 750 ml | 53.11 |

**NEW
EX CELLARS**

## RUFFINO GRAPPA

**GRAPPA RISERVA DUCALE GOLD LABEL**

| | |
|---|---|
| 13913 - carton of 6 bottles x 375 ml | 78.01 |

28

716 218 6216

13914 - carton of 6 bottles x 500 ml                    **104.20**

                                                        **NEW**

## RUFFINO TUSCAN OLIVE OIL                    EX CELLARS

**RUFFINO EXTRA VIRGIN OLIVE OIL**
19974 - carton of 6 bottles x 500 ml                    **46.15**

**SANTEDAME LAUDEMIO EXTRA VIRGIN
OLIVE OIL**
19964 - carton of 6 bottles x 500 ml                    **51.23**

716 218 6216

## BORGO CONVENTI
### (6 x 750 ml. cases)

| WHITE WINES | NEW EX CELLARS |
|---|---|
| Pinot Grigio D.O.C. Collio | $39.93 |
| Chardonnay D.O.C. Collio | $39.93 |
| Sauvignon D.O.C. Collio | $39.93 |

| RED WINES | NEW EX CELLARS |
|---|---|
| Merlot D.O.C. Collio (barrel aged) | $39.93 |

30

716 218 6216

## EXHIBIT C

### INITIAL MARKETING PLAN

| PRODUCT* | CASES PROJECTED TO BE PURCHASED BY FRANCISCAN FROM RUFFINO BEFORE 31 DECEMBER 2005 PURSUANT TO SECTION 5(B) OF IMPORTATION AGREEMENT [9 LITER STD]** |
|---|---|
| **CORE PRODUCTS** | |
| Ruffino Chianti | 240,000 |
| Fonte Al Sole | 12,000 |
| Orvieto | 38,000 |
| Libaio | 16,000 |
| Aziano | 52,000 |
| Il Leo | 11,000 |
| Lumina | 90,000 |
| Ducale Tan | 118,000 |
| Ducale Gold | 40,000 |
| Modus (6 bottles x 750 ml) | 1,000 |
| Ruffino Grappa (6 bottles x 750 ml) | 100 |
| **SUB TOTAL** | **618,100** |
| | |
| **ESTATE COLLECTION** | |
| La Solatia | 750 |
| Santedame | 3,200 |
| Romitorio di Santedame | 650 |
| Lodola Nuova | 2,000 |
| Lodola Nuova Riserva | 300 |
| Greppone Mazzi | 750 |
| *Borgo Conventi Collio Pinot Grigio | 1,000 |
| *Borgo Conventi Collio Sauvignon | 700 |
| *Borgo Conventi Collio Chardonnay | 600 |
| *Borgo Conventi Collio Merlot | 700 |
| **SUB TOTAL** | **10,650** |
| | |
| **GRAND TOTAL** | **628,750** |

*The Borgo Conventi wines and associated Marks may be deleted from the list of Products and from the Trademarks at any time during the Term, at the election of RUFFINO.



31

716 218 6216

**All cases computed based on a standard 9 liter case by volume.

FRANCISCAN will spend $5.5 million on A&P in calendar year 2005 pursuant to Section 5(B)(i).

*   *   *

32

# Exhibit 2

### AMENDMENT TO EXCLUSIVE IMPORTATION AGREEMENT

This Amendment to Exclusive Importation Agreement ("Amendment") is made as of June _15_, 2009 ("Effective Date") by and among RUFFINO S.r.l., an Italian società a responsabilità limitata with its registered office at Via Corsica, 12, Brescia, Italy ("RUFFINO"); CONSTELLATION BRANDS, INC., a Delaware corporation with offices at _____, United States of America ("CBI"); and FRANCISCAN VINEYARDS, INC., a Delaware corporation with offices at _____ __, United States of America ("FRANCISCAN"). RUFFINO, CBI and FRANCISCAN may be referred to herein individually as a "party" or collectively as the "parties".

### RECITALS

A.     RUFFINO and FRANCISCAN are parties to that certain Exclusive Importation Agreement dated as of 3 December 2004 as the same may be amended or restated ("Importation Agreement").

B.     The parties hereto desire to substitute CBI for FRANCISCAN as a party to the Importation Agreement and to otherwise amend the Importation Agreement in certain respects.

### AGREEMENT

In consideration of the foregoing premises and the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     CBI shall be substituted for FRANCISCAN as a party to the Importation Agreement, subject to Section 7 of this Amendment. All references in the Importation Agreement to "Franciscan Vineyards, Inc." shall be changed to "Constellation Brands, Inc."; and all references in the Importation Agreement to "Franciscan" shall be changed to "CBI".

2.     Sections 1(A)(i) and (ii) of the Importation Agreement shall be amended to read in their entirety as follows:

"(i) neither RUFFINO nor any of its subsidiaries shall be deemed to be an 'Affiliate' of Constellation or CBI or any of their respective Affiliates at any time; and (ii) none of the stockholders of CBI or any direct or indirect parent of CBI shall be deemed in such capacity to be 'Affiliates' of Constellation or CBI or their respective Affiliates at any time."

3.     Section 2(F) is added to the Importation Agreement to read in its entirety as follows:

1

"F.     Offer to Produce or Bottle.  CBI undertakes and agrees that in the event that CBI or any person under the direction of CBI develops a new Italian wine concept or product or a private label wine for a CBI customer, to be produced in bulk or bottled in Italy ("CBI Product"), CBI shall first offer RUFFINO the option to produce or bottle the CBI Product in accordance with the specifications required by CBI.  The offer shall be in writing by CBI and shall set forth the material terms and conditions of the proposed production or bottling.  RUFFINO shall notify CBI of its acceptance of the offer within thirty (30) calendar days of receiving the written offer from CBI.  RUFFINO and CBI then shall negotiate in good faith and enter into an appropriate written agreement confirming the terms and conditions of the services to be rendered.  If RUFFINO does not elect to accept the offer within the 30-day period, then subject always to Section 5(F)(ii) hereof, CBI shall be free to seek alternative sources for the production or bottling of the CBI Product on terms and conditions substantially no more favorable than those offered to RUFFINO."

4.     Section 5(F) of the Importation Agreement shall be amended to read in its entirety as follows:

"F.     Acquisition of Competing Products.

(i)     During the Term of this Agreement, nothing herein shall prohibit CBI or its Affiliates from acquiring the ownership or distribution of any Italian wine brand and distributing such brand in the Territory, subject to the provisions of the following subparts (ii) and (iii) of this Section 5(F).

(ii)     If (1) CBI or an Affiliate acquires the ownership or distribution of an Italian wine brand which has a stockkeeping unit ('SKU') which competes with a RUFFINO SKU then being sold by CBI in the Territory under this Agreement, and (2) at any time thereafter CBI and RUFFINO shall fail to mutually agree, in accordance with the terms of Section 5(B) hereof (Marketing Plans), to the volumes of such RUFFINO SKU to be purchased by CBI for sale in the Territory in the upcoming Contract Year, then CBI and RUFFINO, to ensure that RUFFINO suffers no reduction in sales volume of such SKU as a consequence of such acquisition, shall agree in good faith on the public statistical source whose immediately-preceding twelve (12) month market trend for competitive SKUs shall be applied to the immediately preceding twelve (12) months' purchases of the relevant RUFFINO SKU in order to determine the minimum purchase volumes thereof by CBI for the upcoming Contract Year.  Notwithstanding the foregoing, CBI

2

undertakes that the minimum volume purchased in such unagreed Contract Year shall be no less than CBI's highest volume of purchases of such SKU from RUFFINO in the higher of the two Contract Years immediately preceding the acquisition ("Minimum Purchase"); provided that such Minimum Purchase shall be subject to (x) the fulfillment of such orders by RUFFINO at substantially comparable prices to those of the applicable Contract Year, (y) a readjustment in the Minimum Purchase amount by the additional agreement of the parties in good faith in the event market conditions in the Territory show a decline in the market trends for competitive SKUs during the preceding twelve (12) months, or (z) the occurrence of an event of Force Majeure subject further to Section 14(A) hereof (Force Majeure); and provided further that no part of this Section 5(F) shall limit or affect to any extent the termination rights of RUFFINO under Section 13(D) of this Agreement (Termination by RUFFINO). The foregoing purchases will be calculated by SKU to obtain the appropriate mix of Products desired by the parties and as otherwise provided by this Section 5(F).

(iii)     If CBI acquires the distribution, but not the ownership, of the Italian wine brand of a third party in the Territory incidental to the purchase of another company by CBI or an Affiliate, and such brand competes with a RUFFINO SKU, then CBI undertakes and agrees to surrender or terminate the distribution of such third-party Italian wine brand using its reasonable and good faith efforts within six (6) months of the acquisition of such rights; provided however that notwithstanding the foregoing (1) CBI shall not be required to conduct such surrender or termination in a manner or on a schedule that would cause it to incur more than incidental costs and penalties, and (2) during such pending surrender or termination the provisions of Section 5(F)(ii) shall apply to protect the sales of Ruffino in the Territory.

(iv)     Except as otherwise provided by and subject to the provisions of Section 2(F) and this Section 5(F), (A) during the Term of this Agreement CBI shall not import or promote or market or sell or distribute or represent or otherwise dispose of any brands or products of Italian wine of any kind within the Territory at any time, other than the Products under this Agreement, and (B) no Affiliates of CBI shall be subject to the restrictions in the above clause (A) but any such Affiliates shall maintain separate and independent sales and marketing forces from those of CBI in connection with such activities during the Term."

3

[061709 Rev]

5.    The first sentence of Section 14(J) of the Importation Agreement shall be amended to read in its entirety as follows:

"Notwithstanding any contrary provision of this Agreement, neither party shall assign, sell, transfer, delegate, sublicense, encumber or otherwise dispose of, whether voluntarily or involuntarily, and whether by merger or operation of law or otherwise (collectively 'Assignment'), this Agreement or any of its rights or obligations under this Agreement to any other person (excepting an Assignment of this Agreement and all rights and obligations hereunder in their entirety to an Affiliate) without the prior written consent of the other party, which consent may be withheld in the sole and absolute discretion of such other party."

6.    As part of the consideration for this Amendment, the parties hereto mutually waive and release and discharge each other from any and all breaches or other failures to perform by any party under the Importation Agreement at any time prior to and through the Effective Date of this Amendment, including any and all claims or actions or causes of action based thereon.

7.    Notwithstanding the substitution of CBI and without limiting the other rights of RUFFINO, the parties hereto agree that RUFFINO shall have continuing direct and independent rights against FRANCISCAN under each of Section 2(E) (Jointly Developed Products), Section 4(G) (Exclusive Remedies), Section 7 (Confidentiality) and Section 11(A)(iv) (RUFFINO trademarks) of the Importation Agreement, as if FRANCISCAN were an additional continuing party under such provisions.

8.    The parties hereto agree and acknowledge that neither this Amendment nor the substitution of CBI as a party to the Importation Agreement in lieu of FRANCISCAN shall, for purposes of any of the Importation Agreement or that certain Joint Venture Agreement dated as of 3 December 2004 (among Beverage and Brands S.A., MPF International S.A., CB International Finance S.a.r.l. and CBI) or any other relevant agreement, constitute (i) a "Change of Control" as defined therein or (ii) a termination of the Importation Agreement or (iii) any other "Triggering Event" as defined therein.

9.    Capitalized terms not otherwise defined herein shall have the same meanings as in the Importation Agreement. All references to "this Agreement" wherever occurring in this Amendment shall be deemed to refer to the Importation Agreement as amended.

10.    This Amendment is made and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, USA, without regard to the conflict of laws principles thereof, as the same apply to agreements executed solely by residents of New York.    This Amendment shall not be

4

[061709 Rev]

governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is hereby expressly excluded.

11.     If any provision of this Amendment shall be held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Amendment, and the remainder of this Amendment shall remain in full force and effect.  In such event the relevant parties agree to amend and replace any invalid or illegal or unenforceable provision with a valid and legal and enforceable provision which most closely approximates the intent and economic effect of the invalid or illegal or unenforceable provision.

12.     This Amendment may be executed in separate counterparts, each of which when executed and delivered shall constitute an original, but all of which when taken together shall constitute one and the same document.

13.     Except as expressly modified by this Amendment, the Importation Agreement is hereby confirmed in its entirety and shall remain in full force and effect unaffected by this Amendment.  In the event of a conflict between the Importation Agreement and this Amendment, this Amendment shall control.

14.     Each of the parties represents and warrants that it has the right, power and authority to enter into and carry out its obligations under this Amendment, and that this Amendment has been duly executed and delivered by an authorized officer of such party, and constitutes its valid and legally binding agreement and obligation and is enforceable in accordance with its terms.

**[Signature Page to Follow]**

[061709 Rev]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Exclusive Importation Agreement as of the Effective Date.

RUFFINO, S.r.l.

By: _____
Name: Marco Folonari
Title: Presidente Amm.re Delegato
Date Signed: 6/26/09

CONSTELLATION BRANDS, INC.

By: _____
Name: Ronald C. Fondiller
Title: Vice President and Assistant Secretary
Date Signed: 6/22/09

FRANCISCAN VINEYARDS, INC.

By: _____
Name: Ronald C. Fondiller
Title: SVP, General Counsel and Secretary
Date Signed: 6/22/09

27326056\V-6

6

[061709 Rev]

Exhibit 3

| | |
|---|---|
| Data | 18 febbraio 2011 |

| | | | |
|---|---|---|---|
| A | Ruffino S.r.l. | DA | Constellation Brands, Inc. |

| | | | |
|---|---|---|---|
| Telefono | | Telefono | |
| Telefax | +39 030 40889 | Telefax | |
| E-mail | | E-mail | |

| | | | |
|---|---|---|---|
| Vs. Rif. | | Ns. Rif. | |

| | | | |
|---|---|---|---|
| P.C. | | Numero di pagine | 1+2 |

---

Se non doveste ricevere copia leggibili di tutte le pagine, siete pregati di richiamarci al più presto



## Constellation

Constellation Brands, Inc.
207 High Point Drive, Building 100
Victor, New York 14564
phone 585.678.7100
fax 585.678.7103
www.cbrands.com

February 17, 2011

Ruffino S.r.l.
Via Corsica, 12
Brescia, Italy

Re:   Notice of Termination of that certain Exclusive Importation Agreement (the
      "Importation Agreement"), dated as of December 3, 2004, as amended, by and
      between Ruffino S.r.l ("Ruffino") and Constellation Brands, Inc.
      ("Constellation") as successor by amendment to Franciscan Vineyards, Inc.
      ("Franciscan").

Dear Sirs,

This letter serves as notice by Constellation that it is terminating the Importation
Agreement pursuant to Section 13C thereof based on the breaches by Ruffino of its material
obligation under Section 14L to operate in good faith and to deal fairly with Constellation.
Secondarily, Constellation is terminating the Importation Agreement due to the fraudulent
concealment of material facts by Ruffino that wrongfully induced Constellation to cause its
wholly-owned subsidiary, Franciscan, to enter into the Importation Agreement. If those facts
had been properly disclosed, Constellation would not have caused Franciscan to enter into the
Importation Agreement with Ruffino.

Details of the conduct constituting the aforementioned breaches and fraud are set forth in
that certain Request of Arbitration and Appointment of Arbitrator in the interest of Constellation
and its wholly-owned subsidiary, CB International Finance S.A.R.L., against MPF International
S.A. (the "Request"). As set forth in more detail in the Request, at the time Franciscan entered
into the Importation Agreement with Ruffino, management of Ruffino was directly and
personally engaged in illegal activity that ultimately resulted in the conviction of the directors of
Ruffino and punishment under Italian law. If the facts of management's participation in such
illegal activity had been disclosed to Constellation, Constellation would not have caused
Franciscan to sign the Importation Agreement. Moreover, when Constellation became aware of
some facts relating to the illegal activity, Ruffino, in breach of its obligation to operate in good
faith and deal fairly with Constellation, deceitfully and falsely told Constellation and Franciscan
that Ruffino was a victim of the activity and that Ruffino was not and had not been directly or
personally involved in the activity. Ruffino continued to conceal its role in the illegal activity
from Constellation and Franciscan in bad faith, inducing Franciscan and Constellation to
continue to operate over the course of several years.

Pursuant to the Importation Agreement, termination shall be effective sixty (60) days from the date of this letter. Please contact the undersigned as soon as possible so that we can make appropriate arrangements.

Very truly yours,

F. Paul Hetterich,
Executive Vice President

207 High Point Drive, Building 100  Victor, New York 14564
phone 585.678.7100  |  fax 585.678.7103

Exhibit 4

**RUFFINO SHIPMENTS**
9L CASE

|                     | 2004   | 2005   | 2006   | 2007   | 2008   | 2009   | 2010   |
|---------------------|--------|--------|--------|--------|--------|--------|--------|
| IL DUCALE IGT       | na     | na     | 44421  | 12215  | 27816  | 20955  | 21677  |
| RISERVA DUCALE TAN  | 89385  | 90471  | 96993  | 84356  | 83954  | 62023  | 69734  |
| RISERVA DUCALE ORO  | 29975  | 31417  | 37172  | 39157  | 39254  | 23000  | 21627  |
| TOTAL               | 119360 | 121888 | 178586 | 135728 | 151024 | 105978 | 113038 |

**RUFFINO DEPLETIONS**
9L CASE

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| IL DUCALE IGT | na | na | 15450 | 28107 | 27048 | 21344 | 25036 |
| RISERVA DUCALE TAN | 105383 | 102342 | 83702 | 87650 | 75676 | 63344 | 72520 |
| RISERVA DUCALE ORO | 32784 | 31983 | 36546 | 36546 | 29200 | 24170 | 23185 |
| TOTAL | 138167 | 134325 | 135698 | 152303 | 131924 | 108858 | 120741 |

# Exhibit 5



**Constellation Brands, Inc.**
207 High Point Drive, Building 100
Victor, New York 14564
phone 585.678.7100
fax 585.678.7103
www.cbrands.com

To: RUFFINO S.r.l.
Via Corsica, 12
Brescia, Italy

**BY HAND**

Victor, New York, 17 June 2010

**Re: Commitment to purchase Ruffino's Products**

Dear Sirs:

Constellation Brands, Inc., a Delaware corporation with offices at 207 High Point Office Park, Building 100, Victor, New York 14564, United States of America ("**CB**") confirms its undertaking to Ruffino S.r.l. ("**Ruffino**") to purchase 625,561 physical cases of Ruffino's Products during the period 1 January 2010 - 31 December 2010.

Additionally, CB affirms its undertaking, set forth in Section 13 D(ii) of the Exclusive Importation Agreement of 3 December 2004 ("**Agreement**"), to purchase from Ruffino, during each Contract Year in the period beginning on 1 January 2011 and ending on the date of termination of the Agreement, sufficient quantities of the Products to ensure that Ruffino receives at least seventy-five (75%) of the total gross revenues projected to be received by Ruffino from all purchases of Products by CB from Ruffino under the Marketing Plan for such Contract Year at the applicable export sales prices as set forth in the Marketing Plan.

Very truly yours,

CONSTELLATION BRANDS, INC.

BY: _____